345 F.Supp. 316 (1972)
In the Matter of William Amos GRISSOM, Bankrupt.
William Amos GRISSOM, Petitioner on Review,
v.
CONSUMERS MONEY ORDER CORPORATION OF AMERICA, Respondent on Review.
No. 71-B-83.
United States District Court, D. Colorado.
March 29, 1972.
*317 Louis J. Boggio, Denver, Colo., for petitioner on review.
Aldo G. Notarianni, Denver, Colo., for respondent on review.

MEMORANDUM OPINION AND ORDER
ARRAJ, Chief Judge.
This matter is before the court on a petition for review of an order of the referee in bankruptcy. The referee found that a debt owed to Consumers Money Order Corp. of America (Consumers), was non-dischargeable in bankruptcy under § 17(a) (4) of the Bankruptcy Act, 11 U.S.C.A. § 35(a) (4). That section provides:
(a) A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity.
The referee determined that a fiduciary relationship existed between Consumers and the bankrupt, and that the debt had been created by the bankrupt's defalcation. Both of these findings have been challenged, and the matter is now ripe for disposition.
The hearing before the referee established the following facts. Sometime in 1969 the bankrupt's wife, in partnership with another woman, opened a store known as Southwest Ceramics. The bankrupt was never legally involved with the store, although he did lend assistance as needed. At some time after the store opened the women began selling money orders for a company owned by a Mr. and Mrs. Nielsen. This company was acquired by Consumers, and on December 15, 1969, the bankrupt's wife signed an agreement with Consumers in order to continue selling money orders. Consumers required the signatures of two persons for any outlet where their money orders were sold, but Mrs. Nielsen, who was then an employee of Consumers, did not seek a second signature until much later.
The agreement was called a Trust Agreement, but the first paragraph specified that it was "in all respects a license" terminable at will by either party. The agreement established an agency relationship, designating the person selling money orders an agent of Consumers. The agreement provided, in part, that
[t]he Agent agrees to keep the proceeds realized from the sale of money orders IN TRUST and entirely separate and apart from the other moneys of the Agent. Money order funds shall be kept in a safe place at all times. Agreement, paragraph 4.
This is the only provision of the agreement which purports to establish a trust relationship, since in all other respects the agreement establishes an agency for the sale of Consumers' property.
At the time this agreement was signed Consumers provided the store with an account at a nearby bank, and also supplied deposit slips and a money bag. The bank had a night depository, and on several occasions the bankrupt deposited money order funds there for his wife. Sometime during the early part of 1970 Mrs. Nielsen began coming to the store to pick up the funds, making two or three trips each week. At the same time use of the bank account by the store was gradually diminishing, so that by spring of that year all of the proceeds were picked up at the store.
*318 In May of 1970 the bankrupt's wife became seriously ill, and was unable to come to the store. On the evening of May 21, 1970, Mrs. Nielsen came to the store and told the bankrupt, who was there helping out, that she had to get a second person to sign the trust agreement. She explained that Consumers would discontinue sale of the money orders without a second signature, and showed the bankrupt the agreement previously signed by his wife. He glanced at the agreement, and thinking that his wife would prefer to keep the money orders in the store he signed an identical copy.
On the evening of May 28, 1970, the bankrupt helped close the store for the night. He had two bags of money, a small one containing the receipts from the store and a larger one containing some $2500 in proceeds from the sale of money orders. He placed both bags in the bottom of a Coke machine on the premises, using an area intended for the storage of extra bottles. He then pad-locked the machine shut and left. It appears that the bankrupt had left money there before. Moreover, since Consumers had been picking up the proceeds on trips several days apart, it seems reasonable to conclude that Consumers knew that proceeds were frequently kept on the premises overnight.
The next morning the bag containing Consumers' money was gone, and whoever opened the store reported the burglary to the police. The bankrupt signed a police report, and he and his wife both signed a statement for Consumers after discussing the burglary with Mrs. Nielsen. The money belonging to the store was not taken, and the bankrupt testified that he had been told that this bag was out of sight behind some bottles. The police report was not part of the record on review, and there is no indication of the extent of other losses, if any, or of the evidence that the store was broken into. Counsel for Consumers has implied that the bankrupt may have appropriated the money himself, although no actual accusation has been made. We agree that the circumstances, particularly the fact that only one bag was missing, are somewhat questionable. However, the bankrupt was not charged by the police, and there is absolutely no evidence that he did in fact take the money. The only basis for such a conclusion would be the suspicious circumstances, and we are not prepared to infer from such tenuous evidence that the bankrupt fraudulently acquired the money. In fact, Consumers has relied exclusively upon § 17(a) (4), and in doing so has made no attempt to present evidence of theft. Moreover, the referee was careful to conclude that there was no evidence of fraud or willful misconduct, and since that conclusion accurately reflects the facts we are bound by it.
In any event, Consumers made demand upon the bankrupt for the missing proceeds, and when payment was not forthcoming initiated suit in the Superior Court of the City and County of Denver. The suit was not contested, and on September 28, 1970, judgment was entered against the bankrupt in the amount of $2,766.30 plus interest. After proceedings in bankruptcy were commenced Consumers filed an application for a determination of dischargeability. The referee found that § 17(a) (4) controlled, and that the debt was not dischargeable.
The initial question for our determination is whether the bankrupt held the proceeds while acting in a "fiduciary capacity." Section 17(a) (4), quoted above, is the only provision of the Bankruptcy Act which would permit a finding of non-dischargeability here, and if there was no fiduciary relationship that section does not apply.
We have found only two cases on point, and they disagree as to the conclusion reached. The first case, Wayne Creamery v. Clement, 14 Mich.App. 50, 165 N.W.2d 508 (1968), involved an agreement between the creamery and an individual operating an independent delivery route. The creamery provided the defendant with milk, which he sold, and he accounted to the creamery for the *319 proceeds. The court held that a normal creditor-debtor relationship had been created, and that a provision in the agreement providing that proceeds be held "in trust" did not change the relationship to one of a fiduciary. Id. at 510-511. This case is very similar to the one before us, with the exception that the agency held money orders rather than milk. This is a significant difference, however, in that the unsold money orders had no intrinsic value. Consequently, while the creamery extended "credit" in the value of the milk delivered to the operator, Consumers could not place a value on the money orders. Rather, their value was determined as they were sold, and thus it is rather difficult to find that Consumers extended "credit" in any particular amount.
The second case is Morgan v. American Fidelity Fire Ins. Co., 210 F.2d 53 (8th Cir. 1954). In that case an insurance agent signed an agreement with an insurance company, which provided that proceeds from the sale of policies were to be held in trust for the company. The court held that the terms of the agreement prevailed, and that as a matter of law a fiduciary relationship existed. This case is also similar to the one before us, except for the significance of the agreements to the respective debtors. In Morgan the debtor's livelihood depended to some extent on the agreement, and it was tantamount to an employment contract. In the case before us now, the bankrupt signed the agreement as a favor to his wife, and he did not depend upon the income from the money orders for his support. It seems much more reasonable to hold an insurance agent to the specific terms of an agreement, in the circumstances of that case, than it does to hold the bankrupt to the terms of the agreement with Consumers. In fact, the Morgan court specifically relied on the facts of the case, which included willful misappropriation of funds, in reaching its conclusion. Id. at 55. Thus, the specific terms of the agreement, which are the principal source of similarity between these cases, were not controlling.
The other cases we have found are of little assistance, since they deal with situations where a fiduciary relationship unquestionably existed. E. g., Kadish v. PHX-Scotts Sports Co., 11 Ariz.App. 575, 466 P.2d 794 (1970) (officers and directors of corporation making unauthorized expenditures of corporate funds); Western Surety Co. v. Reed, 79 N.M. 647, 447 P.2d 672 (1968) (failure of Justice of the Peace to remit funds due to county); Hamby v. St. Paul Mercury Indemnity Co., 217 F.2d 78 (4th Cir. 1954) (real estate agent misappropriated client's funds); National Surety Co. v. Wittich, 185 Minn. 321, 240 N.W. 888 (1932) (shortage in funds over which postmaster had control); Syracuse v. Roscoe, 66 Misc. 317, 123 N.Y.S. 403 (1910) (city treasurer held responsible for funds unaccounted for despite discharge in bankruptcy). It appears that the referee relied upon the last two cases in coming to his conclusion. Those cases are indeed valuable for the proposition that "defalcation" does not require any criminal, and perhaps not even negligent, behavior. However, in both cases the courts held that the debt was created while the bankrupt was a "public officer," and thus never discussed the requirements for a fiduciary relationship.
We are of the opinion, after considering all of these cases, that the referee erred in concluding that a fiduciary relationship existed. While the cases do not provide any clear answer, they do suggest that the facts of each case are the most important consideration in determining the nature of the debt. In the case before us, the facts establish beyond question that the bankrupt did not intend to enter a fiduciary relationship with Consumers. He signed the agreement only because he was told that his signature was necessary if the money orders were to remain in the store, and he felt that his wife would prefer to keep them. He was not a partner in the business, nor was he legally involved in *320 any way. Because the bankrupt did not have any real stake in the operation of the store, his signing the agreement was not a business decision. Therefore, he did not have the immediate, personal interest in the effect of the agreement which existed in Morgan, supra, and it would be totally unfair to hold him to the specific language of one paragraph of the agreement. His signing the agreement, like his handling of money order proceeds, was done as a favor to his wife and not as an attempt to enter into any kind of business relationship with Consumers. He was not specifically informed of the nature of the agreement, nor of its possible effect, and though he glanced over it he did not read it because his wife had already signed an identical agreement. It would be highly questionable to infer from these facts that he thought he had assumed any special obligation to Consumers, let alone to assume that he knew or intended that a trust relationship had been formed.
Counsel has made much of the suspicious character of the circumstances surrounding the burglary, but his suspicions are inappropriate. The only basis for non-dischargeability available to Consumers is § 17(a) (4) and its requirement of a "fiduciary capacity." Even if we were to assume, which we do not do, that the bankrupt misappropriated the funds himself, that would have no bearing on the nature of the relationship. Therefore, since we find that no fiduciary relationship existed, and since Consumers has made no showing that it is entitled to relief under any other provision of the Bankruptcy Act, we conclude that the debt was dischargeable. Obviously, we do not reach the question of whether storing money in a Coke machine was a "defalcation," and we are not in any way suggesting an answer to that question by our holding here.
For the reasons set forth herein it is
Ordered that the order of the referee in bankruptcy be and the same hereby is reversed. It is further ordered that the debt owed to Consumers be and the same hereby is discharged.