In the Matter of FALK OF BETHLEHEM et al., Bankrupts.

Falk & Falk et al., Debtors.

Norman Falk, Debtor.

UNITED RETAILERS OF EASTON, INC., et al., Plaintiffs,

v.

FALK OF BETHLEHEM et al., Bankrupts, Defendants.

UNITED RETAILERS OF EASTON, INC., et al., Plaintiffs,

v.

Leah FALK and Oscar Falk, Debtors, Defendants.

UNITED RETAILERS OF EASTON, INC., et al., Plaintiffs,

v.

Norman FALK, Debtor, Defendant.

Bankruptcy Nos. B–76–71, B–76–981 and B–76–2664.

United States Bankruptcy Court, D. New Jersey.

March 24, 1980.

See also, Bkrtcy., 2 B.R. 609.

Paulette M. Lemay, Jersey City, N. J., for plaintiffs, United Retailers of Easton, Inc., et al. ("Unishops").

Markowitz & Zindler, Lawrenceville, N. J., for bankrupts/debtors, Falk of Bethlehem et al.; Falk & Falk et al. and Norman Falk.

## OPINION

RICHARD W. HILL, Bankruptcy Judge.

A petition for arrangement under Chapter XI of the Bankruptcy Act was filed by debtors, Oscar and Leah Falk, on or about March 26, 1976. Thereafter, on August 27, 1976, their son, Norman Falk, also filed a petition for an arrangement under Chapter XI. Prior to the individuals' filing, the corporations,[1] of which Oscar and Leah Falk were principal stockholders, filed petitions for an arrangement under Chapter XI. On January 13, 1978, United Retailers of Easton, Inc. (hereinafter "Unishops") filed a complaint against the above-mentioned debtors,[2] seeking to have certain debts[3] declared non-dischargeable, pursuant to Sections 17(a)(2) and 17(a)(4) of the Bankruptcy Act. Unishops' complaint is two-fold. Firstly, Unishops contends that debtors, as corporate officers, misappropriated monies held in trust for Unishops. Secondly, Unishops contends that the terms of payment of a $365,000.00 indebtedness were extended by Unishops in reliance upon materially false statements of debtors.

Prior to the petitions in bankruptcy, Norman Falk, along with his parents, Oscar and Leah Falk, operated through their numerous corporations, food and discount stores in Pennsylvania and New Jersey. Unishops, Inc., and its various subsidiaries[4] were engaged in the business of selling mens and boys clothing in leased departments of debtors' stores.

In the early 1960's plaintiff corporations entered into numerous licensing agreements, as lessees, with corporations owned and controlled by Oscar and Leah Falk. Each store had a separate licensing agreement, and the terms of each varied. Central to all the agreements was a provision for a central checkout system. This central checkout system provided that all purchases made by customers of the lessee would be paid for at a central checkout counter to be maintained by lessor. The merchandise, fixtures and employees were supplied by Unishops. The monies were collected by the Falks. Some of the licensing agreements permitted the commingling of these funds with other funds of the lessor.[5] Others provided for the establishment of separate bank accounts for the deposit of the monies resulting from the sale of Unishops'

---

1. The corporations joined in this litigation were Falk of Bethlehem, Inc., and its subsidiaries, Falk's Food Basket of Philadelphia, Inc., Falk's Food Basket of Easton, Inc., Falk of Palmer, Inc. and Falk of Warren, Inc. *See* Nos. B–76–71, B–76–74, B–76–75, B–76–76 and B–76–77.

2. For purposes of this suit, the complaints of Unishops against Norman Falk, Oscar and Leah Falk as Falk & Falk, and Falk of Bethlehem, Inc., have been consolidated.

3. By Affidavit of Amount Due, filed April 13, 1978, the amount claimed due and owing from debtors to the Unishops corporations was $413,408.55.

4. Subsidiaries of Unishops, Inc., a New York corporation, involved in this litigation, included United Retailers of Easton, Inc., Unishops of Nazareth, Inc., and Unishops of Taylor, Inc., corporations of the State of Pennsylvania, and Unishops of Sommerville, Inc., a corporation of the State of New Jersey.

5. Lease agreements between Falk of Bethlehem, Inc. and Unishops of Taylor, Inc., and Falk's Food Basket of Easton, Inc. and United Shirt Shops, Inc. provided that the proceeds from sales could be commingled with other funds of the licensor. The agreement between Falk's Food Basket and United Shirts provided, nevertheless, that "Licensee's money shall be considered as held in trust for Licensee until paid over to Licensee."

merchandise, so called "trust accounts."[6] The lease agreements further provided that the lessor account and make settlement with the lessee each week for all sales, after deducting rent, advertising costs and other charges. Lessor was to keep true and accurate account of all sales.

As of October 1974, the defendant corporations collectively owed plaintiff, as a general unsecured obligation, a sum in excess of $300,000.00, having defaulted on the various trust fund and remittance requirements of the licensing agreements. By letter of September 13, 1974, plaintiffs informed defendants that due to defendants' default it intended to install its own cash registers and collect its own sales in stores where its Mens' and Boys' Division was doing business.[7] The agreements provided for their installation in case of default. To forestall such situation, Oscar, Norman and Steven Falk executed and delivered to the plaintiff their personal guarantee of the corporate obligations.[8] By the terms of the "Agreement and Guarantee", the Falks promised that payments would be made to Unishops on a weekly basis of all monies due and owing it under the License Agreement. Unishops, in turn, agreed to defer installation of its own departmental cash registers.

Subsequently, the Falk corporations were unable to meet their obligations under the October 1974, agreement. Again, to forestall Unishops taking any action against the corporations, a meeting was held in January 1975, at Unishops' Jersey City, New Jersey office between representatives of Unishops and Norman Falk. Unishops contends that Norman Falk attended this meeting as agent for his parents, as well as on his own behalf. At this meeting, three documents were executed: 1) an agreement between the various Falk corporations and plaintiff corporations extending the time for payment of the corporate debt, reaffirming the obligation of the Falk corporations to "hold as trust funds only for the benefit of Licensees" proceeds from sales made from plaintiffs' departments [9] and modifying the previous license agreement to provide that at the end of each business day the Falks would deposit gross proceeds of sales in a bank depository account set up by and for the benefit of the licensees (Unishops); 2) an unconditional Personal Guarantee of Full Payment signed by Oscar, Leah, Norman and Steven Falk; and 3) a mortgage in the sum of $365,000.00 given by Oscar and Leah Falk to Unishops, Inc., on a piece of land known as "Rush Farm" to secure the corporate obligation.

Plaintiffs seek a determination by this Court of the non-dischargeability of the above debt under Sections 17(a)(2) and 17(a)(4). It is Unishops' contention that debtors were to hold monies in trust for plaintiffs pursuant to the license agreements but misappropriated the same while acting in a fiduciary capacity, thus making the debt nondischargeable under Section 17(a)(4). Furthermore, plaintiffs contend that on or before January 31, 1975, each of the defendant corporations was indebted to plaintiffs in a sum in excess of $365,000.00 and that terms of the payment were extended by plaintiffs in reliance upon materially false statements concerning a mortgage given plaintiffs, made by or endorsed by defendant Norman Falk, as officer of defendant corporations, making the debt non-dischargeable under Section 17(a)(2).

The Court addresses, firstly, the question of dischargeability under Section 17(a)(4). Section 17(a)(4) provides that a debtor will not be released from any debts "created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity."

---

6. Lease agreements between Falk's of Warren, Inc. and Unishops, Inc., Falk of Palmer, Inc. and Unishops, Inc., Falk of Sommerville, Inc. and Unishops of Sommerville, Inc. provided that the "Lessor shall not co-mingle said trust funds with other funds of Lessor and other similar trust funds held by Lessor."

7. *See* U-8 Ev.

8. At that time, Leah Falk did not execute nor deliver her guarantee. Furthermore, no collateral was given to the plaintiffs at this time.

9. See P-3 Ev.

The term "fiduciary" has been consistently limited by the courts to apply only to express or technical trusts and not to trusts imposed *ex maleficio,* that is, a trust imposed because of an act of wrongdoing out of which the debt arose or a trust imposed by the law from contracts. See *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 208, 11 L.Ed. 236 (1844); *In re Thornton,* 544 F.2d 1005, 1007 (9th Cir. 1976); *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 511 (2d Cir. 1937); 1A *Collier on Bankruptcy,* para. 17.24 (14th ed. 1978). The courts will find a trust relationship where state statutory law imposes fiduciary duties. See *In re Romero,* 535 F.2d 618 (10th Cir. 1976); *In re Kawczynski,* 15 CBC 332 (W.D.N.Y.1977); *In re Angelle,* 425 F.Supp. 823 (W.D.La.1977). Furthermore, courts have viewed insurance agents as fiduciaries within the purview of Section 17(a)(4). *Hamby v. St. Paul Mercury Indemnity Co.,* 217 F.2d 78 (4th Cir. 1954); *Guernsey-Newton Co. v. Napier,* 151 Wash. 318, 275 P. 724 (1929).

Where, however, the relationship is essentially one of debtor-creditor, the courts will not find that a trust relationship existed prior to the act of wrongdoing. The United States Supreme Court has held that a factor who sells his principal's goods and retains the money is not a fiduciary within the meaning of Section 17(a)(4). *Chapman v. Forsyth, supra; Neal v. Clark,* 95 U.S. 704, 708, 24 L.Ed. 586 (1878). The *Chapman* Court noted:

> If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act.

*Chapman, supra* at 208. Likewise, conversion by a creditor who holds collateral deposited as security for a debt is not regarded as fraud committed in a "fiduciary capacity" as envisioned by Section 17(a)(4). See *Crawford v. Burke,* 195 U.S. 176, 25 S.Ct. 9, 49 L.Ed. 147 (1904); *Hennequin v. Clews,* 111 U.S. 676, 4 S.Ct. 576, 28 L.Ed. 565 (1884). These decisions preclude the transformation of an ordinary commercial indebtedness into a non-dischargeable fiduciary debt.

The use of the word "trust" in an agreement between the parties or use of a "trust receipt" will not alter a relationship between the parties, which is essentially borrower-lender, nor change the resulting obligation to one arising from a trust. *Bloomingdale v. Dreher,* 31 F.2d 93, 95 (3d Cir. 1929). *See also Aetna Acceptance Co., supra,* 293 U.S. at 334, 55 S.Ct. at 154. It is the character of the debt relationship and not its form which is determinative in finding a "trust" within Section 17(a)(4). See *Wayne Creamery v. Clements,* 14 Mich.App. 50, 165 N.W.2d 508, 510–11 (Ct.App.1968). In the *Wayne Creamery* case, a Michigan appellate court found that where a milk route lessee had agreed to "hold in trust" for the creamery all accounts receivable due from milk route customers, the lessee's indebtedness was not created while acting in a fiduciary capacity within Section 17(a)(4) insofar as a normal debtor-creditor relationship had been created. The provision that the proceeds be held "in trust" did not change the relationship. *Id.* at 510–11. The simple fact that agreements are drafted with trust provisions will not necessarily make the agreement a trust agreement, nor create a fiduciary relationship. *See In re Grissom,* 345 F.Supp. 316, 318–20 (D.Colo. 1972).

The Court notes several cases concerning department leasing agreements. Where all sales were made in the lessor's name, the proceeds immediately turned over to the lessor with the understanding that such funds could be commingled with the lessors' own funds, the lessor paying over to lessee

a net amount, not on demand but on agreed days, the courts have not found a trust relationship. *See In re Lord's, Inc.,* 356 F.2d 456 (7th Cir. 1965), *cert. denied,* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966); *In re Martin's,* 11 F.Supp. 99 (E.D.N.Y. 1935). In labelling the relationship debtor-creditor, these courts emphasized that from the time of receipt until settlement date some days later, lessor had unrestricted use of the funds. *In re Lord's, Inc., supra* at 458. On somewhat different facts, a fiduciary relationship has been found. Where the agreements plainly stated and provided for a separate account of monies collected, such money collected by the trustee and receiver after bankruptcy was held to be trust fund money. *United States Nat'l Bank v. Blauner's Affiliated Stores, Inc.,* 75 F.2d 826 (3d Cir. 1935). The *Blauner's* court noted that there would be no difficulty in tracing the sums collected by the receiver and trustee on the credited items and therefore refused to find this merely a debtor-creditor relationship. *Id.*

■ Similarly, the "hold in trust" provisions of the various licensing agreements between the Falk corporations and Unishops must be analyzed according to the above cases. The fact that the licenses contain trust provisions does not *per se* make the agreements trusts. The Court must look beyond the trust provision to determine the true substance of the transaction and relationship of the parties.

■ The burden of proving that a debt comes within one of the exceptions to Section 17 is upon the party opposing discharge of the debt. See *In re Thornton, supra* at 1006; 1A *Collier on Bankruptcy,* para. 17.24 (14th ed. 1978). Unishops must prove that the debt is non-dischargeable under Section 17(a)(4).

Unishops contends that the trusts imposed by the licensing agreements constitute true trusts within the meaning of Section 17(a)(4). Unishops offers as evidence the licensing agreements as they existed both prior to and subsequent to January 31, 1975.

The majority of licenses as originally drafted contain the following provision:

It is agreed that all monies received by Lessor by reason of the sales made by Lessee through its department shall be held by Lessor as Trustee only for the benefit of Lessee and shall be considered, at all times, as private individual funds of Lessee until proper accountings shall be held by and between the parties as herein provided. Lessor shall not co-mingle said trust funds with other funds of Lessor and other similar trust funds held by Lessor.

Unishops offers as evidence of a trust prior to January 1975, the fact that Unishops' controller Harvey Goldberg, in the period between August 1974, and January 1975, requested prompt payment of the trust monies from the Falks. Mr. Goldberg admitted, however, that he did not remember specifically asking for segregation of the trust funds *per* the so called "trust" provisions. It was, in fact, the general policy of Unishops to not enforce trust provisions in all their licensing agreements. Their policy rather, was to get prompt payment of money.

Norman Falk contends, and the Court finds, that at no time during the history of dealings with the parties commencing in 1963 until the end of 1974 did Unishops ever seek to enforce the so-called trust provision of the licensing agreements. There is no evidence that Unishops ever requested an audit of the Falk accounts. Norman Falk testified that it was never the policy of the Falk corporations under the licensing agreements to keep separate or segregated accounts for Unishops' sales proceeds. Debtor further testified that to his knowledge there were never any objections to such a policy by Unishops.

The Court finds that as to those agreements which did not call for segregation of lessor's and lessee's funds, a trust relationship did not arise. *See In re Lord's, Inc., supra; In re Luckey, Platt and Co., Inc.,* 14 CBC 673 (S.D.N.Y.1977); *In re Martin's, supra.* Clearly, debtors, prior to the date on which the agreements called for an account-

ing, *i. e.,* within a week, had freedom to use the funds as they chose, subject only to general provisions that such funds were nevertheless "held in trust." There is no indication that prior to January 1975, debtors assumed the equitable duties to handle "trust" funds for the benefit of the lessee, that is, to deal with property for the benefit of lessee as defined in a trust relationship. *See Carlson, Inc. v. Commercial Discount Corp.,* 382 F.2d 903, 905 (10th Cir. 1967). As the *Carlson* court stated, the facts indicate, rather, the creation of an obligation to repay a portion of the funds at stated times. *Id.* at 905. "The obligation assumed by the lessor-bankrupt is nothing more than an obligation to settle an account." *Id.*

Even if the Court were to follow the rationale of the *Blauner's* court to find a trust relationship imposed as to those agreements which specifically provided for the establishment of separate bank accounts, *Blauner's* can be distinguished on the facts. On the one hand, the *Blauner's* case involved the imposition of a trust *after* bankruptcy had begun. Furthermore, Unishops may be estopped to raise the *Blauner's* rationale where it can be shown that neither debtors nor Unishops at any time prior to January 1975, attempted to enforce the terms of the trust agreements. If parties in their day-to-day affairs disregard the trust provisions of a contract by acquiescing in conduct contrary thereto, the court will not find the intent that a trust relationship exists. See *In re Frank F. Clark,* 2 Bankr. Ct.Dec. 199 (W.D.Mich.1975); *In re Harry George Witsen,* 3 CBC 455 (D.N.J.1975). In the *Clark* case, an insurance agent who by contract had agreed to hold all premiums received in trust for the plaintiff company was held not a "fiduciary" within the meaning of the Bankruptcy Act where defendant's general practice was to deposit and pay the premiums out of its general account and plaintiff acquiesced in such practice. *Id.* at 199–201. As the court noted, the business arrangement between the parties "knowingly disregarded the trust provision in the contract and acted upon a debtor-creditor relationship." *Id.* at 200. The provision in the contract requiring the agent to

hold premiums in trust had been waived by the business practice and knowledge of this practice by the plaintiff. *Id.* at 200. Similarly, the *Witsen* court held that a financier's acquiescence in late or partial payment of debtor's sales out of trust, pursuant to a dealer floor plan arrangement which expressly called for payment by debtor upon sale of each item, converted debtor's duty to account as a fiduciary to one of debtor-creditor. 3 CBC at 459. The *Witsen* court recognized that the question of whether a fiduciary relationship exists is determined by the facts of each case and that in the above case the actual terms of dealing between the parties showed that debtor was not acting in a fiduciary capacity. *Id.*

The evidence shows that at no time before January 31, 1975, did either Unishops or the Falks attempt to enforce the trust provision by insisting on segregation of funds. In practice, both parties clearly disregarded the trust provisions. All receipts from the Falk stores were placed in the stores' bank accounts and transfers were made from the store accounts to a central checking account. Remittance was made weekly to Unishops from one account with one check covering all stores, which Unishops accepted. Therefore, in their actual course of dealing the relationship created was one of debtor-creditor. The trust provisions were effectively waived. *See In re Frank F. Clark, supra; In re Harry George Witsen, supra.*

■ This Court must conclude that Unishops did not meet its burden of proving that the trust provisions, as they existed prior to January 1975, were "true trusts" within the meaning of Section 17(a)(4). Again, the plain fact that the license agreements contained trust language does not make the relationship one of trust. *See In re Walter Reade Organizations, Inc.,* 16 CBC 125, 127 (S.D.N.Y.1978); *In re Grissom, supra; Wayne Creamery, supra.* Unishops has not proven that the debt of the Falks was anything but an ordinary commercial indebtedness created by breach of the provisions of the licensing agreements.

Any action on the part of Unishops to see that these provisions were adhered to does not, in itself, create a trust relationship, but only speaks to remedying a contractual breach. A trust relationship did not then exist prior to the act of wrongdoing, as required by Section 17(a)(4), but rather, arose, if at all, as a result of the wrongdoing—the misappropriation of funds to be held for and remitted to Unishops. Viewing the law as consistently excluding from Section 17(a)(4) trusts imposed *ex maleficio*, see *Aetna Acceptance Co., supra,* 293 U.S. at 333, 55 S.Ct. at 153; *In re Thornton, supra* at 1007, the Court concludes that the debt created under the licensing agreements, as they existed prior to January 1975, was not a "fiduciary" debt made nondischargeable under Section 17(a)(4).

Plaintiffs further seek to prove that even if the licensing agreements as they existed prior[⸱] to January 1975, were not "true trusts", the agreements of January 1975, create an even stronger basis for finding a "trust" within Section 17(a)(4).[10]

Unishops asserts that subsequent to January 1975, it engaged in a strong program of enforcement of the trust fund provisions. Under the "Agreement" executed January, 1975,[11] between the Falk corporations and the Unishops subsidiaries, plaintiffs agreed to extend time for payment of monies due, and defendants repeated their intention to hold all monies "as Trustees." The agreement further provided that defendants "at the end of each business day . . . deposit all such funds directly into a bank depository account maintained by and for the benefit of the . . . Licensee." Mr. Goldberg testified that prior to the execution of the above documents, the Unishops subsidiaries opened up separate bank accounts. He further tesified that Unishops was in continuous contact with the Falks to assure that daily deposits were made.[12]

The relationship that existed between Unishops and debtors subsequent to the January 1975 agreement is clearly different in kind from that which existed under the licensing agreements. While the January 1975 agreement can be viewed as reaffirming the duties of the Falks as licensors to keep account of monies owed Unishops, the debtors also agreed to make deposits each business day of the gross proceeds of sales in specified bank depositories set up by and for the benefit of licensees. The designation of separate bank accounts, and the provisions for daily deposits, indicates that unlike the case under the licensing agreements, debtors did not have free use of such funds prior to accounting but rather had the duty to handle such funds for the benefit of each lessee. Norman Falk testified that the policy of the Falk corporations after January 1975, was to make daily deposits of Unishops' sales proceeds into special accounts. Such evidence supports the finding of a trust relationship. *See Wohl Shoe Co. v. Elliott,* 388 F.2d 883, 885 (9th Cir. 1967). *See also Commercial Discount Corp., supra; In re Lord's, Inc., supra; Blauner's, supra.* It is also significant that after January 31, 1975, Unishops did not acquiesce in tardy payment by debtors, but, rather, actively sought to enforce the trust provision. In evidence are a series of letters written between February 1975 and February 1976, advising Norman Falk of his default in the daily deposit requirement and of the balance due.[13]

Since Unishops has met its burden of proving a "true trust" was created by the January 1975 agreement, the Court concludes that the debt created by the licensing agreements, as they existed subsequent to January 1975, was a "fiduciary" debt, nondischargeable under Section 17(a)(4).[14]

**10.** As of January 31, 1975, the total aggregate due Unishops, including interest, was $413,-408.55. The amount retained by the debtors after January 31st totaled, as of March 31, 1978, $36,564.53.

**11.** See P–3 Ev.

**12.** See U 1–5 Ev.; U 10–16 Ev.

**13.** See U 1–5 Ev.; U 10–16 Ev.

**14.** The amount of indebtedness is $36,564.53. This computation is based upon an Affidavit of Amount Due, filed by Unishops on April 13, 1978. A provision in the Pretrial Order states

■ The Court must next determine which of the parties are liable for the post-January 1975 debt. Falk of Bethlehem, Inc., as the corporate debtor, is clearly liable. Likewise, this Court finds that Norman Falk, individually, is liable because he served as treasurer of the Falk corporations throughout the relevant time period and was primarily responsible for handling the proceeds of Unishops' sales. The Court finds, however, that neither Leah nor Oscar Falk should be liable for the debt. There is no proof of wrongdoing on either of their parts in the handling of the funds owed Unishops. While Oscar Falk was president of the Falk corporations prior to January 1975, he relinquished that post as of that time. He is an elderly man. There is no evidence that he actively involved himself in the financial affairs of the business after that time. Similarly, Leah Falk was secretary of the corporate defendants until mid-1975, but the Court finds no evidence that she was involved in handling or decision making respecting funds. The Court enters a finding of no cause of action in favor of Oscar and Leah Falk and discharges the Unishops debt as to them.

The Court must finally address the issue of the non-dischargeability under Section 17(a)(2).

Section 17(a)(2) provides that a discharge in bankruptcy shall release a debtor from any debts which "are liabilities for obtaining money or property by false pretenses or false representation, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published in any manner whatsoever with intent to deceive."

The dispute here involves a mortgage on property known as "Rush Farm" owned by Oscar and Leah Falk and obstensively offered by Norman Falk to plaintiffs at the January 1975 meeting as collateral security

for the debt owing to plaintiffs under the licensing agreements.

More specifically, at issue are representations as to the number and amount of existing mortgages on the property made by Norman Falk to Unishops at the January 1975 meeting. Unishops claims that Norman Falk falsely represented to it that there was only one mortgage on the property, for approximately $90,000.00. After the meeting, Unishops ordered a title search to determine the number of mortgages on the property. While the search erroneously revealed only a single mortgage in the amount of $90,000.00, it was later discovered that there was an additional mortgage of $147,000.00.[15] Unishops claims that it accepted the mortgage as security for the debt and extended time for payment, relying upon the fact that there was only a single $90,000.00 mortgage prior to the mortgage offered Unishops and that there was sufficient equity to cover the amount of Unishops' debt.

■ Again, Unishops has the burden of proving that the debt is non-dischargeable within Section 17(a)(2). In order for Section 17(a)(2) to bar a discharge, the alleged fraudulent representation must have been made with an intent to deceive and defraud and the creditor must have relied on the representations in acting to his prejudice. *Bazemore v. Stehling*, 396 F.2d 701, 702 (5th Cir. 1968); *Greenfield State Bank v. Copeland*, 330 F.2d 767, 768 (9th Cir. 1964); *Schapiro v. Tweedie Footwear Corp.*, 131 F.2d 876, 878 (3d Cir. 1942); *In re Dolnick*, 374 F.Supp. 84, 90 (N.D.Ill.1974); *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540, 543 (W.D.Va.1967). In other words, the party opposing discharge must prove "positive fraud." *See Neal v. Clark, supra;* 1A *Collier on Bankruptcy,* para. 17.24 (14th ed. 1978). Additionally, the statement made must have been false in a material way. *In re Dolnick, supra.* It is not necessary that the false representation be in writing in

---

that in the absence of objection by debtor, the amount specified in the Affidavit shall be binding on the parties.

15. The Rush farm purchased by Oscar and Leah Falk consisted to two parcels. First purchase money mortgages of $90,000.00 and $147,000.00 were given on each parcel.

order for the debt to be exempted from discharge. See 1A *Collier on Bankruptcy,* para. 17.16 (14th ed. 1978).

A financial statement which is merely erroneous but not prepared with any intention to deceive is not a false statement within the meaning of Section 17(a)(2). *In re Dolnick, supra* at 90. The wrong committed must be one involving "moral turpitude or intentional wrong" as opposed to fraud implied in law, where the element of intentional wrong is lacking. See *Sanitation Recycling, Inc. v. Jay Peak Lodging Assoc., Inc.,* 428 F.Supp. 1022, 1024 (D.Vt. 1977); 1A *Collier on Bankruptcy,* para. 17.16 (14th ed. 1978). Section 17(a)(2) has been interpreted to extend to situations where representations as to financial solvency were "recklessly" made and relied upon in the extension of credit. *In re Matera,* 436 F.Supp. 947, 949–50 (E.D.Wis.1977).

The ultimate facts required to make Section 17(a)(2) operative must, however, be inferred in most instances by the trier of fact from objective facts found, since they involve a conclusion as to the state of mind of the maker of the representation. *Tweedie Footwear Corp., supra* at 877–78. The Court must closely examine the context of the statements made by Norman Falk to determine if they were recklessly or fraudulently made and whether there is any basis to prove reliance by Unishops.

Two specific representations were made by Norman Falk at the January 1975 meeting with Unishops. Norman Falk represented to Unishops that the value of the farm was $1,000,000.00. According to testimony of Norman and Oscar Falk, this opinion as to the value of the property, reached prior to the meeting by Norman, together with Oscar and Leah Falk, the owners, was independently based on a previous offer [16] to purchase a portion of the property which they had received from Two Guys in the amount of $650,000.00. Unishops has put forth no evidence that the $1,000,000.00 valuation was false. Furthermore, Unishops itself concedes that the valuation represent-

ed was nothing more than the opinion of the Falks. The Court finds nothing in these facts to conclude that the representation was made with intent to defraud. Even if the court were to find that the statement was made with requisite intent, Unishops' recognition that it was only debtors' opinion militates against a finding that Unishops relied to any extent upon this valuation when it decided to extend its credit.

The more troublesome question involves the representation made by Norman Falk to Unishops at the January 1975 meeting, concerning the number and amount of mortgages existing on the Rush property and whether such representations can be construed as a deceit as to Unishops. Norman Falk testified that he was authorized by Oscar and Leah Falk to discuss with Unishops the giving of a mortgage on his parents' piece of real estate as collateral for the debt. Norman Falk recognized that the mortgage would put Unishops in a secured position vis-a-vis the aforementioned corporate debts. Norman was also authorized to offer his mother's guarantee. Up to this time she had no personal liability to Unishops.

The Court has heard conflicting testimony regarding the precise representations made. Norman Falk testified that he believed the equity in the property to be in excess of $350,000.00, based upon a valuation of $1,000,000.00 and that it was due to such equity that the Rush property was chosen as security. Norman Falk further indicated in his testimony that he accurately represented to Unishops the balance due in dollar amounts on the mortgages and the fact that there were no mortgages ahead of the Rush mortgages. The difficulty arises insofar as Norman Falk, according to his own testimony, represented only that there was a "Rush position" on the property. In fact, there were two separate first mortgages on the Rush property covering two

16. About 1974 or 1975, prior to the time Unishops received the mortgage, Oscar and Leah

Falk had an option to sell 20 acres for approximately $650,000.00.

separate parcels [17]—one for $90,000.00 and another for approximately $147,000.00.

Mr. Goldberg testified that at the January 1975 meeting Norman Falk represented that there was one prior mortgage on the Rush property in the approximate amount of $100,000.00.

To determine whether Norman Falk intended to defraud Unishops by offering the mortgage this Court must closely examine the circumstances under which the statements were made.

Present at the January 1975 meeting were Norman Falk, Falk's accountant Richard Norwalk, Unishops' Treasurer Harvey Goldberg, and Unishops' Vice President of Finance and Administration, John Kuehn. The Court finds no evidence upon which to conclude that Norman Falk acted recklessly in offering the Rush mortgage. Norman Falk came to the meeting with a book of properties and assets and his accountant intending to offer Unishops, an unsecured creditor, some security for its debt. There is no real evidence, as Goldberg testified, that Norman Falk induced Unishops to accept the mortgage—it was offered to better Unishops' position vis-a-vis other creditors. It was intended, and did, make Unishops a secured creditor. Even if Norman Falk misstated the number of mortgages on the Rush farm, the context in which it was made does not raise that inaccuracy to the "moral turpitude" or "intentional wrong" required to prove fraud under Section 17(a)(2). *See Neal v. Clark, supra.* Unishops' allegation that Norman Falk intentionally misstated the mortgages to better the financial condition of the Falk business is uncorroborated.

While the Court accepts Goldberg's testimony that Unishops took the mortgage believing there was sufficient equity over the stated $100,000.00 mortgage to secure its debt, Goldberg, himself, admitted that the extent of the equity was in part a measure of the value of the property—of which there was only Falk's opinion. Furthermore, Goldberg admitted that he suggested

a title search of the property to check out whether the Rush property was mortgaged to a greater extent than Norman Falk had indicated. The ordering of a title search in this context is a clear indication to the Court that Unishops did not rely to a significant extent on any statements made by Norman Falk. Rather, those statements were in fact discounted.

There is also no clear evidence that Unishops relied to its detriment on Norman Falk's statements. *See Sanitation Recycling, Inc., supra* at 1024–25. To prove that one is the "unsuspecting victim" of positive fraud is a heavy burden. *See id.* Unishops has not proven to this Court that when it accepted the mortgage as security for the corporate debt that it did forbear any real options, which would have improved its position.

The Court thus finds that Unishops has not met its burden of proving under Section 17(a)(2) that Norman Falk defrauded Unishops. The debt is discharged as to Norman Falk consistent with the Court's findings of non-dischargeability under Section 17(a)(4).

The liability of both Oscar and Leah Falk and the corporate defendants is dependent upon the liability of Norman Falk. Since Unishops failed to prove Norman's liability, Unishops has failed to prove the non-dischargeability of the debt, pursuant to Section 17(a)(2) as to Oscar and Leah Falk. Likewise, the corporations are discharged from the debt consistent with the Court's previous finding of non-dischargeability under Section 17(a)(4).

Judgments shall be submitted consistent with the opinion of the Court.

---

17. Norman Falk testified that the two parcels of land, on which there was each a mortgage, were always considered as one property—the "Rush Farm."