In re Leonard A. LEVITAN, Debtor.

**CONGRESS FINANCIAL CORPORATION,**
Plaintiff,

v.

**Leonard A. LEVITAN, Defendant.**

**Bankruptcy No. 883–31431–18.
Adv. No. 883–0742–18.**

United States Bankruptcy Court,
E.D. New York.

Feb. 14, 1985.

Morse Geller, Forest Hills, N.Y., for debtor.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Congress Financial Corp.

## DECISION & ORDER

C. ALBERT PARENTE, Bankruptcy Judge.

On October 24, 1983 Congress Financial Corporation (the "creditor") commenced an adversary proceeding seeking to bar discharge of a $254,000 debt owed to it by Leonard A. Levitan (the "debtor"). The creditor claims that the debt is nondischargeable pursuant to several provisions of 11 U.S.C. § 523 in that the debt arose out of the debtor's 1) fraud or defalcation while acting in a fiduciary capacity (§ 523(a)(4)); 2) embezzlement (§ 523(a)(4)); 3) act of willful and malicious injury upon the creditor or its property (§ 523(a)(6)); 4)

false pretenses or false representation (§ 523(a)(2)(A)).

Both parties have submitted memoranda of law and a hearing was held on June 14, 1984.

## BACKGROUND

The debtor was a director and officer (Vice-President and Secretary) of, and a shareholder with a one-third interest in, Halcolite Company, Inc. and Halcolite Imports Corp. (collectively "Halcolite"). In August 1980, Halcolite, experiencing financial difficulty, entered into a financing arrangement with the creditor, a commercial finance corporation. The terms of this arrangement were contained in several documents including an "Accounts Receivable Financing Agreement (Security Agreement)," (hereinafter the "Accounts Receivable Financing Agreement") and a "Security Agreement (Inventory Lien) and (Machinery and Equipment Loan)" (hereinafter the "Inventory Lien Agreement").

Pursuant to the Agreements, the creditor, at its discretion, would lend Halcolite money calculated as a percentage of Halcolite's inventory and accounts receivable. As collateral for these loans Halcolite assigned its current and after acquired inventory, equipment and receivables to the creditor. The proceeds of the collateral were to be remitted to the creditor in kind, *i.e.*, the debtor was to turn over the identical checks, cash, money order, etc., received from its customers. Pursuant to the terms of paragraph 3 of the Accounts Receivable Financing Agreement, Halcolite was to hold until delivery any proceeds it received "as [the creditor's] property, and as trustee of an express trust for [the creditor's] benefit." The Inventory Lien Agreement had a similar provision.

The Agreements containing these provisions were signed on behalf of Halcolite by Halcolite's President on August 21, 1980. The debtor and the two other Halcolite principals signed as primary guarantors on this same date.

The parties agree that until early May 1981, the Agreements were substantially but not strictly complied with. The credi-

tor, on occasion, without protest, accepted Halcolite's checks in lieu of the actual proceeds received by Halcolite. Transcript of hearing held on June 14 (the "June 14 Tr.") at 33–4.

The infusion of funds from the creditor did not solve Halcolite's financial problems. In May 1981, Halcolite, in an effort to stop or postpone the collapse of its business, used the proceeds of the creditor's collateral to meet its payroll, and pay for merchandise and other business expenses.

The debtor testified that the decision to use the proceeds was made by the two other principals of Halcolite and that he opposed their decision. June 14 Tr. at 71. There is no evidence other than the debtor's testimony of his opposition. The debtor admits he did nothing to stop his co-principals from proceeding with the diversion.

Both parties agree that all the proceeds diverted from the creditor were used for business purposes. There is no evidence that the Halcolite principals acted in other than the corporation's interest.

On May 14, 1981 Halcolite and the creditor met to discuss Halcolite's financial difficulties and Halcolite's request for additional funding. The principals of Halcolite, and Halcolite's attorney, were present at this meeting. The creditor advised Halcolite that it believed Halcolite's financial future too precarious to justify additional financing.

At this meeting the creditor asked Halcolite why it had not received remittances for several days and demanded an accounting. *Id.* at 22. Halcolite's attorney admitted that Halcolite's principals had withheld proceeds of approximately $67,000. The principals agreed to meet with representatives of the creditor the following day at which time the debtor, on behalf of Halcolite, would deliver the withheld funds.

The following day, representatives of the creditor met with the debtor to accept delivery of the funds. At this meeting, the debtor gave the creditor a Halcolite check for $30,000 as part payment for the approx-

imately $67,000 Halcolite had diverted. June 14 Tr. at 20–26.

Shortly after this meeting, on May 26, Halcolite closed its doors and surrendered its collateral to the creditor. An auction was held on June 25. The proceeds from this sale were insufficient to satisfy Halcolite's debt to the creditor and the creditor is still owed approximately $254,000.

On July 27, 1983 the debtor filed for individual bankruptcy relief under Chapter 7 of the Bankruptcy Reform Act (the "Code"). He scheduled the Halcolite debt he had guaranteed to the creditor. It is this debt the creditor seeks to except from discharge.

## DISCUSSION

Pursuant to 11 U.S.C. § 727 a debtor who files for relief under Chapter 7 of the Code is discharged from most debts he incurred before filing for relief. The discharge of these debts is intended to facilitate a primary bankruptcy purpose: to give the honest debtor a fresh start. As the Supreme Court has said:

> This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.

*Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), citing other cases.

■ Certain kinds of debts, enumerated in 11 U.S.C. § 523, are excepted from this discharge. Many of the exceptions are intended to prevent a debtor from avoiding through bankruptcy the consequences of his wrongful conduct. *In re Cross,* 666 F.2d 873 (5th Cir.1982). A guiding principle in analyzing these exceptions is that they be narrowly and strictly construed, so as to assure that the basic bankruptcy policy of giving an honest debtor a fresh start is not frustrated. *In re Materetsky,* 28 B.R. 499, 502 (Bankr.S.D.N.Y.1968).

## I

The creditor first argues that the debt is nondischargeable under that part of § 523(a)(4) which bars the discharge of a debt which arose from the debtor's "fraud or defalcation while acting in a fiduciary capacity."

In order to succeed on this ground the creditor must demonstrate that the debtor was acting in a fiduciary capacity as this term has been construed by federal courts. *In re Schwartz*, 36 B.R. 355, 358 (Bankr.E. D.N.Y.1984). The Code itself does not define the term.

In an early Supreme Court case decided under the predecessor provisions of § 523(a)(4), the Court held that the term fiduciary was to be limited to those who were fiduciaries under a "technical" trust. "[T]he statute speaks of technical trusts, and not those which the law implies from the contract." *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 298, 11 L.Ed. 236 (1844).

As a general rule, technical trusts may be created by an agreement between the parties to impose a trust relationship; they are commonly referred to as express trusts. *See, e.g., In re Paley*, 8 B.R. 466, 469 (Bankr.E.D.N.Y.1981). Recently several courts have held that a technical trust may also be created by a statute which expressly imposes fiduciary obligations on a party; these are denominated "statutory trusts." *See, e.g., In re Kawczynski*, 442 F.Supp. 413 (W.D.N.Y.1977).

The creditor does not contend and the court does not find that the debtor was a fiduciary under a statutory trust.

The debtor was an officer, director, and shareholder of a New York corporation. As such his responsibilities to the corporation's creditors are defined by New York law. New York does not impose the express fiduciary obligation required by § 523(a)(4) upon the director, officer, or shareholder of a corporation towards its creditors. *See In re Gulick*, 186 F. 350, 351 (S.D.N.Y.1911): "The officers of a corporation—certainly the vice president and secretary—are not express fiduciaries [for

purposes of the nondischargeability provision]." *See also Materetsky*, 28 B.R. at 500, in which the court held that the principal shareholder and president of the corporation did not have the technical fiduciary obligation to the corporation's creditors contemplated by § 523(a)(4).

Thus, if the debtor was a fiduciary within § 523(a)(4), it was by virtue of the agreement between the parties.

Under traditional trust law, a trust is a fiduciary relationship with respect to property, which subjects the person who holds title to the property to equitable duties to deal with the property for the benefit of another. This relationship arises as a result of a manifestation of the parties' intention to create it. *In re Adkisson*, 26 B.R. 879, 882 (Bankr.E.D.Tenn. 1983) *citing* Restatement (Second) of Trusts § 2 (1959). Thus, the basic prerequisite to the creation of a trust is that the parties intend to create a fiduciary relationship with respect to the property.

Courts are divided as to whether a commercial security agreement which contains a declaration of trust and imposes fiduciary-like duties upon a debtor manifests the intent to create the fiduciary relationship required by § 523(a)(4).

Several courts have held that a security agreement which contained an express declaration of trust and an identifiable trust res, and imposed fiduciary-like duties upon the debtor manifested the requisite intent to create a § 523(a)(4) trust relationship. *See, e.g., In re Falk of Bethlehem*, 3 B.R. 266 (Bankr.D.N.J.1980).

Other courts have held that commercial security agreements by nature are not truely trust agreements and cannot invoke the required trust relationship. *E.g., In re Miles*, 5 B.R. 458 (Bankr.E.D.Va.1980).

In a recent opinion in which the creditor contended that the debtor was a "fiduciary" under the statute, the Second Circuit declined to decide this question: "In the absence of ... a contractual obligation [that the debtor hold the proceeds of the creditor's collateral in trust] we need not

decide whether a trust account obligation can convert a debtor-creditor relationship into a fiduciary relationship for purposes of ... the Act." *In re Banister,* 737 F.2d 225, 228 (2d Cir.1984).

▮ This court, for the reasons that follow, finds that an agreement which is essentially a commercial security agreement in which the creditor has used trust language and imposed obligations on the debtor to secure repayment of his loan does not create the fiduciary relationship required by § 523(a)(4).

In three leading Supreme Court cases, the Court successively narrowed the definition of fiduciary so that the term would not reach commercial debtor-creditor transactions in which the debtor merely violated the terms of his agreement with the creditor.

In *Chapman v. Forsyth,* the Supreme Court, construing a predecessor provision of § 523(a)(4), held that a debtor, who violated the terms of a commercial contract, and failed to turn over the proceeds from the sale of the creditor's goods to the creditor, was not a fiduciary for purposes of the nondischargeability provision. The contract contained no language purporting to create a trust. It was in this context that the Court held that the statute applied only to technical and not implied trusts. The rationale articulated by the Court is instructive:

> If the act embrace such a debt, it will be difficult to limit its application.... Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust.

*Id.,* 43 U.S. at 207.

In *Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891), the Court held that even if the agreement contained language imposing a trust upon the debtor it would not necessarily invoke the requisite fiduciary obligation. The Court held it

was necessary to examine the nature of the obligation.

> The statement in the paper ... [that the debtor] accepts the trust mandate [does] not create a 'trust' in its technical sense, or make the debt ... one created by him while acting in a fiduciary capacity. *The relation created was merely the usual one of contract between debtor and creditor.*

*Id.* at 375, 11 S.Ct. at 316 (emphasis supplied).

The Court went on to find that the non-dischargeability provision was intended to reach those who, like public officers, guardians, and executors, occupied a fiduciary relationship before the time they incurred the debt sought to be barred from discharge.

> It is to be noted that the language of ... the act of 1867 excepts debts created by the bankrupt 'while acting in any fiduciary character,' ... the language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created.

*Id.* at 378, 11 S.Ct. at 318.

The section would then reach only those whose debt arose as a result of the breach of this trust obligation, and not the commercial debtor whose debt preceded the default in the agreement.

In *Davis v. Aetna Acceptance Corp.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the Supreme Court further narrowed the scope of the term fiduciary and ruled that even if the security agreement used trust language and imposed some trust-like duties upon the debtor it would not necessarily create the requisite fiduciary relationship.

The debtor in *Davis* was an automobile dealer who borrowed money from a commercial lender to finance the purchase of his inventory. As security for these loans the debtor gave the creditor a trust receipt in which he agreed to hold the automobiles as the creditor's property and not to sell them without the creditor's written permission. The Court pierced the agreement between the parties and held that "whatev-

er its [trust] recitals, [it was] a mortgage in another form." *Id.* at 334, 55 S.Ct. at 154.

In addition to these Supreme Court cases, lower courts which have considered the issue have also showed an unwillingness to find that a commercial security agreement imposed a fiduciary obligation upon the debtor.

In *Bloomingdale v. Dreher,* 31 F.2d 93 (3d Cir.1929), the debtor was an automobile dealer who signed a purchasing and financing Agreement embodied in part in a "trust receipt." Under the terms of the Agreement the creditor purchased the cars and delivered them to the dealer/debtor. The debtor assigned his interest in the cars to the creditor and agreed to hold the cars "in trust" for him. The debtor could not sell these cars without the creditor's consent and upon the sale of a car the debtor was to deliver the proceeds to the creditor. The debtor breached the Agreement and sold cars without the creditor's consent; he then withheld delivery of the proceeds. The debtor subsequently declared bankruptcy.

The court construed the Agreement and determined that despite the language used and the obligations the Agreement imposed upon the debtor, the Agreement did not make the debtor a fiduciary:

> [T]he transaction was one of borrowing and lending money, which created a debt.... That debt did not arise out of any fiduciary relations, howsoever comprehensively that term be construed.

*Id.* at 94–95.

In *Miles,* 5 B.R. at 460, the debtor and the creditor executed a security agreement which provided that the debtor would hold the proceeds of the collateral in the form in which remitted, in a separate account, in trust for the creditor. Despite the express declaration of trust and the imposition of a fiduciary's duties upon the debtor, the court held that:

> It is abundantly clear that the relationship between the parties in the present case was that of creditor and debtor and nothing else.... Verbal legerdemain does not impose a fiduciary duty on the debtor—'the resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust.'

*Id.* at 460, quoting *Davis v. Aetna Acceptance Co.*

■ This court, based on the analysis of *Chapman* and its progeny, concurs with *Miles* and holds that a security agreement between a commercial creditor and debtor is not transformed into a trust for purposes of § 523(a)(4) by the insertion of trust language and the imposition of duties upon the debtor for the protection of the collateral. It is appropriate for the creditor to draft an Agreement which minimizes his risk of loss and protects his collateral. It is not appropriate to make the mere violation of the security agreement a bar to a debt's dischargeability by attempting to transform what is in essence a security agreement into a trust agreement.

"The exceptions to discharge were not intended and must not be allowed to swallow the general rule favoring discharge." *In re Cross,* 666 F.2d 873, 880 (5th Cir. 1982). If security agreements like the one signed by Halcolite and the creditor were found to impose a fiduciary obligation upon the debtor, creditors could easily make fiduciaries out of ordinary commercial debtors and the exception might indeed swallow the rule.

■ Furthermore, even if the court found that the agreements created a trust relationship between the signatories (the creditor and Halcolite), it would not find that they imposed a fiduciary obligation upon the debtor personally.

As a general rule corporate shareholders, officers and directors are not personally liable on agreements on which they sign on behalf of the corporation.

> It is axiomatic in the law of agency that when there is a disclosed principal the agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or super-add his personal liability.

*State Mutual Life Assurance Co. v. Peat, Marwick, Mitchell & Co.,* 49 F.R.D. 202, 211 (S.D.N.Y.1969), *quoting Mencher v. Weiss,* 306 N.Y. 1, 4, 114 N.E.2d 177, 179 (1953) (corporate officers not bound by agreement they signed on behalf of corporation).

The creditor has not presented clear and explicit evidence that the debtor intended to serve as a fiduciary.

The creditor contends that the debtor evinced intent to serve as a fiduciary when he agreed to act as primary guarantor of the agreements. But one who signs as primary guarantor to a fiduciary's agreement does not thereby make himself a fiduciary of the original agreement.

> The mere fact that a person becomes a surety on a bond of a fiduciary does not place the surety's obligation within clause (4), and the claim against the surety who becomes bankrupt is dischargeable, although the claim against his principal would not be.

3 Collier on Bankruptcy, ¶ 523.14, p. 523–105 (15th ed. 1984) citing cases. Although the debtor did agree to guarantee the corporation's performance he did not agree to act as a fiduciary as required by § 523(a)(4). Those few courts which have found a principal had a fiduciary duty under his corporation's trust agreement have done so without discussing whether the principal had expressly agreed to act as a fiduciary under the agreement. *Falk of Bethlehem,* 3 B.R. 266. Other courts have held that a principal was a fiduciary under a statutory trust where the statute explicitly imposed the fiduciary obligation on *both* the corporation and the principal. *E.g., Carey Lumber Co. v. Bell,* 615 F.2d 370, 373 (5th Cir.1980).

The agreements used by the parties were standard security agreement forms which the creditor drafted for use with its borrowers. They contain detailed, broad provisions giving the creditor a panoply of rights and remedies with respect to the operation of the debtor's business and the protection of the collateral. They do not require that the debtor serve as fiduciary.

Thus, even if the agreements created a trust relationship between the creditor and Halcolite they do not make the debtor a fiduciary.

Inasmuch as the creditor has failed to demonstrate that the debtor was acting in a fiduciary capacity when the debt was incurred, the court need not determine whether the debtor has proved that the creditor's failure to strictly enforce the agreements constituted a waiver of the "trust" provisions.

## II

The creditor also contends that the debt is nondischargeable under that part of § 523(a)(4) which excepts from discharge debts resulting from the debtor's embezzlement.

The question of whether a debtor committed embezzlement under § 523(a)(4) is determined under federal law. *In re Graziano,* 35 B.R. 589, 594 (Bankr.E.D.N.Y.1983).

Under federal law embezzlement is the fraudulent appropriation of property from its owner. 3 Collier on Bankruptcy, ¶ 523–14[3] at 523–107 (15th ed. 1983). Bankruptcy courts have held that for purposes of § 523(a)(4) embezzlement also requires that the creditor demonstrate that the debtor appropriated the property for his own benefit. *In re Graziano,* 35 B.R. at 595, citing other cases.

By definition a person cannot embezzle property which he owns; the property must be the "property of another." "This phrase has almost universally been construed to mean that the property alleged to have been embezzled must be wholly the property of another; the [alleged embezzler] cannot have any interest therein whatsoever." "Property—Embezzlement by a Cotenant," 29 N.Y.U. L.Review 759 (1954), citations omitted. Thus to establish embezzlement the creditor must prove that Halcolite had no ownership interest in the property. And it must prove this non-ownership by clear and convincing evidence. *Graziano,* 35 B.R. at 593. Any ambigui-

ties in the agreements shall be construed against the creditor who drafted the agreements. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1207 (2d Cir.1970).

 The agreements are not free from ambiguity. They do not clearly and convincingly divest Halcolite of ownership of the collateral. Under the agreements the parties provided that Halcolite would assign its title and interest to the collateral to the creditor, but that Halcolite was to retain ownership of the collateral except for the liens and encumbrances of the secured party.

Although an assignment ordinarily operates to transfer the assignor's "ownership" of the property transferred, it does not necessarily do so.

A legal assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless *in some way qualified*, it is properly the transfer of one's whole interest in an estate, or chattel, or other thing.

6 Am.Jur.2d § 1 (emphasis supplied).

The assignment of Halcolite's interest in the collateral was qualified: the agreements do not divest Halcolite of its ownership of the property.

In light of this court's finding that the creditor did not have the required ownership interest in the collateral the court need not decide whether the creditor has demonstrated that the debtor's use of the proceeds to pay corporate debts constitute the personal benefit required by *Graziano*, 35 B.R. at 593.

### III

The creditor pleads § 523(a)(6) as a third ground for excepting its debt from discharge. Section 523(a)(6) applies to debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."

 The term "malicious" has no fixed meaning in cases where a debtor violates the terms of a security agreement. *In re Langer*, 12 B.R. 957 (D.N.D.1981). In gen-

eral, to be willful and malicious, an act must be intentional, wrongful, necessarily harmful and without just cause or excuse. *In re Simpson*, 29 B.R. 202, 212 (Bankr.N. D.Iowa 1983) *citing* 3 Collier on Bankruptcy ¶ 523.16[1] 523–120 (15th ed. 1979). "Standing alone, the failure to pay-over money received from the sale of secured property is not sufficient to show willful and malicious injury." *Id.* at 212, *citing In re Graham*, 7 B.R. 5 (Bankr.D.Nev.1980).

Courts which have excepted from discharge debts where the debtor violated a security 'agreement have generally required the presence of an "aggravating feature" as evidence from which to infer "malice." *Langer*, 12 B.R. at 960. Aggravating features have included: intent to do harm to the creditor, *In re Hodges*, 4 B.R. 513, 516 (W.D.Va.1980); intent to obtain personal benefit at the expense of the creditor, *In re Auvenshine*, 9 B.R. 772 (Bankr. W.D.Mich.1981), *In re Eisner*, 35 B.R. 86 (Bankr.N.D.Ohio 1983); the deliberate violation of the creditor's rights after the creditor moved to assert his rights, *Simpson*, 29 B.R. at 213; the debtor's on-going active concealment of his violation of the security agreement, *Eisner*, 35 B.R. at 88.

 In the instant case the creditor has failed to demonstrate the presence of an "aggravating factor." The creditor does not contest the debtor's assertion that all the proceeds were used by Halcolite for the operation of its business. Although the debtor was secondarily liable to many of the Halcolite business creditors paid during this period there has been no demonstration that the debtor gained a personal advantage by paying these other business creditors before paying the plaintiff creditor.

The court rejects the creditor's argument that the corporation's use of the proceeds to stay in business was intended to benefit the debtor at the expense of the creditor. Again, there is no proof that the debtor sought to gain personal advantage by paying the other business creditors before paying the plaintiff creditor. And although

the debtor as a principal shareholder of Halcolite would obviously have benefitted from an improvement in the corporation's affairs, the creditor would also have benefitted had the efforts to stop the collapse of Halcolite been successful. Thus, the creditor has failed to show that the debtor improved or intended to improve his financial situation at the expense of the creditor.

Nor has the creditor demonstrated any ongoing active concealment by the debtor. In *Eisner*, on which the creditor relies, the court inferred malice based on evidence that the debtor repeatedly misled the secured creditor into believing that proceeds due the creditor would be forthcoming when in fact the debtor had misappropriated these funds for his own use, as well as the corporation's. It was based on this conduct that the court inferred the malice. *Eisner*, 35 B.R. at 88–9.

In the instant case no such malice can be found.

■ The use of the creditor's funds took place over a one week period. There is no evidence that the debtor attempted to mislead the creditors concerning their use of the proceeds. When questioned by the creditor at the May 14 meeting, the Halcolite principals admitted they had withheld the proceeds. After this meeting, the debtor and the other Halcolite principals cooperated with the creditor in the liquidation of Halcolite and collection of receivables for the creditor.

Thus, the debtor's conduct in violating the security agreement does not contain the "aggravating factor" which would render his debt nondischargeable.

### IV

■ The creditor's last theory is that the debt is nondischargeable under § 523(a)(2)(A) which excepts debts:

for obtaining money, property, services, or an extension, renewal or refinance of credit by false pretense, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

In order to succeed in this theory the creditor must show: a) the alleged false representation was made with intent to deceive, and b) the creditor relied on the representation and thereby advanced the money, property, services, etc. which gave rise to the debt. *See, e.g., Falk of Bethlehem*, 3 B.R. at 275.

The creditor has not sustained its burden with respect to either of these elements.

The creditor contends that the debtor falsely represented in the Agreements that he would remit all receivables to them. It has introduced no evidence that at the time the debtor made this statement he intended to violate this agreement.

The creditor also contends that at the May 14 meeting the debtor's attorney acknowledged the withholding of the proceeds but deliberately failed to tell them that these proceeds had been used. The debtor disputes this and asserts that the creditor was informed of the diversion at this meeting. June 14 Tr. at 73.

Even were the court to accept the creditor's version of what transpired at the May 14 meeting, there is no evidence that the creditor acted in reliance on the alleged omission. Although the creditor did advance additional funds to Halcolite after the May 14th meeting, these advances were made after the debtor had given the creditor the $30,000 Halcolite check and after the creditor had clear knowledge of the diversion.

CONCLUSION

As the court in *Miles* held, "[O]n balance the court is presented with an honest debtor who lost everything because he was unable to better manage his business." *Miles*, 5 B.R. at 461. The creditor has not proved that the debt should be excepted from discharge. Therefore this adversary proceeding is dismissed.

It is SO ORDERED.