**In the Matter of Curtis Fred HOLLAND and Cynthia S. Holland, Debtors.**

**Martin Terrell GAY, Plaintiff,**

v.

**Curtis Fred HOLLAND, Defendant.**

**Bankruptcy No. 84–51228.**

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

May 7, 1987.

Arthur L. Phillips, Macon, Ga., for plaintiff.

William J. Self, Macon, Ga., for defendant.

ROBERT F. HERSHNER, Jr., Chief Judge.

## STATEMENT OF CASE

On November 6, 1984, Curtis Fred Holland and Cynthia S. Holland, Debtors, filed a joint petition for relief under Chapter 7 of the Bankruptcy Code. Coleman Tidwell was appointed as trustee of their bankruptcy estate on December 5, 1984.[1] Martin Terrell Gay, Plaintiff, filed a complaint to determine dischargeability of debt against Curtis Fred Holland, Defendant, on February 4, 1985. The complaint came on for trial on December 9, 1985. The Court, having considered the evidence presented at trial, now publishes its findings of fact and conclusions of law.

## FINDINGS OF FACT

Prior to filing his petition for relief, Defendant worked at Brown & Smith Insurance Agency, Inc. (Brown & Smith) and was secretary-treasurer of that corporation. Brown & Smith was a corporation set up for the purpose of selling insurance. Plaintiff worked at Liberty Federal Savings & Loan Association and was Defendant's friend. Sometime in late 1983, Defendant discussed with Plaintiff the possibility of Plaintiff investing with Defendant in a premium finance company.[2] The premium finance company would finance in-

---

1. William M. Flatau was originally appointed trustee of Debtors' bankruptcy estate on November 6, 1984, but that appointment was voided by an order of the Court dated December 5, 1984.

2. In the premium finance business, an insurance policy is purchased by the insured, who makes an initial down payment on the insurance policy. After a finance arrangement is entered into by the insured and the premium finance company, the premium finance company pays off the balance of the insurance premium. The insured then pays the amount financed to the premium finance company on a monthly basis.

surance premiums on individual homeowner and automobile insurance policies purchased through Brown & Smith, but it would not finance premiums for commercial insurance policies.

In January of 1984, Plaintiff and Defendant discussed borrowing $100,000 to invest in the premium finance company. Shortly thereafter, they borrowed $70,000 from First Atlanta bank, executing a promissory note in favor of First Atlanta for $70,000. Plaintiff and Defendant are both jointly and severally liable on the promissory note. As collateral for the promissory note, Plaintiff put up rental property he owned and Defendant put up his personal residence. At the time the money was borrowed, Defendant did not tell Plaintiff that he had already started the premium finance company, which was named Professional Premium Service. Defendant also did not tell Plaintiff that some insurance premiums were already financed and that there was another investor, Ken Smith. Defendant told Plaintiff that Professional Premium Service would be incorporated and that stock would be issued for the corporation.

Plaintiff testified that Defendant told him that the loan proceeds from First Atlanta would be used only for the purpose of financing insurance premiums. Plaintiff further testified that he and Defendant had verbally agreed not to take any money from Professional Premium Service for their personal use for at least eighteen months. Plaintiff relied on these representations when he and Defendant borrowed the money from First Atlanta.

Professional Premium Service was operated at the same office as Brown & Smith, and both businesses used the same employees. Defendant managed the day-to-day operations of both businesses. Plaintiff would come by the office or talk with Defendant about the progress of Professional Premium Service several times weekly. Defendant furnished Plaintiff with monthly reports of Professional Premium Service, and from these reports and Defendant's statements to Plaintiff, Plaintiff believed that the business was operating profitably.

As Plaintiff and Defendant had agreed, Professional Premium Service financed insurance premiums for customers who came to Brown & Smith for individual homeowner or automobile insurance policies, provided the customers met certain criteria. Generally, a contract setting up the payment obligations and related matters was taken at the time Professional Premium Service agreed to finance an insurance premium. After the customer had paid the down payment on the insurance policy, Professional Premium Service issued a check to Brown & Smith for the remaining balance on the insurance policy. Payments received by Brown & Smith on individual homeowner and automobile insurance policies were deposited into the regular bank account of Brown & Smith.

The evidence shows, however, that Professional Premium Service often deviated from its general practice. It did not have signed contracts for all of the accounts being financed. On occasion, Professional Premium Service would issue a check to Brown & Smith for the full amount of the insurance premium, including the amount of the down payment which the customer already had paid. Some of the premium finance contracts were drawn up for accounts on which no insurance policy was ever issued. Also, Brown & Smith deposited a check, dated March 27, 1984, for $8,500 from Professional Premium Service into its commercial bank account, instead of its regular bank account. Brown & Smith deposited another check, dated March 29, 1984, for $12,000 from Professional Premium Service into its commercial bank account. The testimony established that Brown & Smith's commercial bank account was used only for the transaction of business connected with insurance policies issued for commercial accounts.

Katherine R. Barnes, originally Defendant's secretary, was the office manager at Brown & Smith, and she also dealt with the Professional Premium Service accounts. She testified that payments received on the Professional Premium Service accounts were totaled daily and then deposited into Professional Premium Service's bank account at First Atlanta. While she was not

the only employee who handled the daily receipts and deposits, Mrs. Barnes was the primary one. Mrs. Barnes testified that occasionally there was a discrepancy in the daily receipts and the funds on hand, and that on at least one occasion, she asked Defendant if he had taken any money from the daily receipts without telling anyone. Defendant denied doing so. Based upon the balance of Professional Premium Service's bank account, Defendant would decide on an amount that Professional Premium Service could pay to Brown & Smith on insurance premiums it had financed that day, and Professional Premium Service would issue a check to Brown & Smith. Mrs. Barnes would prepare this check, and Defendant would sign it.

Defendant testified that he occasionally made short-term loans to Brown & Smith from Professional Premium Service's funds when Brown & Smith was short on funds. Defendant felt that the success of Brown & Smith depended upon Professional Premium Service and that the success of Professional Premium Service depended upon Brown & Smith. Plaintiff was unaware that Defendant was transferring funds between the two businesses. Defendant also used Professional Premium Service's funds to pay for an item for personal use and not for use by Professional Premium Service. Defendant paid for the item with a check drawn upon Professional Premium Service's bank account. Defendant testified that he reimbursed Professional Premium Service with cash within two weeks.

In July of 1984, Plaintiff first became aware that Professional Premium Service was having financial problems. Defendant contacted Plaintiff and told Plaintiff that he believed Mrs. Barnes was embezzling money from Professional Premium Service because there was a discrepancy in Professional Premium Service's financial records. On July 12, 1984, Defendant fired Mrs. Barnes and took over her duties in addition to his other responsibilities. Around July 23, 1984, Plaintiff and Defendant had Quinton Childers, who had previously done accounting and bookkeeping for Professional Premium Service, come in to determine how much money was missing from Profes-

sional Premium Service. The exact amount was never determined, but Mr. Childers estimated the amount to be between $9,000 to $15,000. When Mr. Childers informed Plaintiff and Defendant of this, Defendant told Plaintiff that Defendant owed Professional Premium Service approximately $12,000, but failed to tell Plaintiff for what. In early August of 1984, Tim Sasser, a certified public accountant, also examined Professional Premium Service's financial records and discovered that Professional Premium Service had a cash shortage in an indeterminate amount. Mrs. Barnes and Defendant both accused each other of taking the money, while both maintained their own innocence. Plaintiff testified that for 1984, a total of $17,165.40 more was received by Professional Premium Service than was deposited into Professional Premium Service's bank account.

On or around August 15, 1984, the time when Defendant stopped operating Professional Premium Service, Professional Premium Service was not incorporated and no stock had ever been issued. At this time, Defendant turned over all of Professional Premium Service's records, accounts, and contracts to Plaintiff and Arthur L. Phillips, an attorney. Defendant testified that when he turned over these documents to Plaintiff and Mr. Phillips, there were accounts receivable totaling $45,000. Subsequently, Defendant turned over to these parties two checks, one for $5,597.21 and one for $3,825.55, representing money collected on Professional Premium Service accounts.

After Plaintiff got Professional Premium Service's records, he proceeded to collect on the outstanding accounts. The Georgia Insurance Commissioner told Plaintiff not to collect on accounts that did not have a signed insurance contract. Plaintiff therefore could not collect on several accounts. Plaintiff testified that $40,880 plus interest is still owed on the promissory note Plaintiff and Defendant gave to First Atlanta. As of the trial, Plaintiff has paid $24,138 to First Atlanta. First Atlanta has foreclosed on Defendant's residence. Professional

**362**

Premium Service's bank account presently has $1,105 in it.

## CONCLUSIONS OF LAW

Plaintiff asserts that the indebtedness owed by Defendant to Plaintiff constitutes a nondischargeable debt under section 523(a)(2)(A)[3] and section 523(a)(4)[4] of the Bankruptcy Code. These sections provide that:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> ....
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or
>
> ....
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

11 U.S.C.A. § 523(a)(2)(A) (West Supp. 1987); 11 U.S.C.A. § 523(a)(4) (West 1979).

The Court will first address Plaintiff's assertion under section 523(a)(2)(A). To meet his burden of proof under section 523(a)(2)(A), Plaintiff must prove the following:

> [That] the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; his reliance was reasonably founded; and the creditor sustained a loss as a result of the representation. The debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality. The burden is on the creditor to prove the debtor's culpability by clear and convincing evidence.

*Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986) (footnote and citations omitted); *First National Bank of Commerce v. Dove (In re Dove)*, 78 B.R. 630, 635 (Bankr.M.D.Ga.1986).

■ After carefully considering the evidence presented, the Court concludes that Plaintiff has failed to prove the elements of section 523(a)(2)(A) by clear and convincing evidence. *Collier on Bankruptcy* notes that:

> Not all frauds are included within the exception of section 523(a)(2)(A), but only those which are involved in the obtaining of money, property or services by "false pretenses or false representations." ... It must ... affirmatively appear that such representations were knowingly and fraudulently made, and that were relied upon by the other party.... [T]he exception operates when the debtor is entrusted with money to be used for a specific purpose and has no intention of using it for that purpose.
>
> ....
>
> Actual fraud, by definition, consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.

3 *Collier on Bankruptcy* ¶ 523.08[4], [5] (15th ed. 1987) (footnotes and accompanying citations omitted). Based upon the meaning of these terms, the Court is unable to find that Defendant obtained money through false pretenses, a false representation, or actual fraud by convincing Plaintiff to borrow money to be used in Professional Premium Service. The Court is persuaded that at the time they obtained the loan, Defendant intended to use it to finance insurance premiums through Professional Premium Service. The evidence supports a finding that the loan proceeds of $70,000 were deposited into Professional Premium Service's bank account. Out of this account, Professional Premium Service wrote

---

**3.** 11 U.S.C.A. § 523(a)(2)(A) (West Supp.1987).

**4.** 11 U.S.C.A. § 523(a)(4) (West 1979).

checks to Brown & Smith for the purpose of financing insurance premiums.

The evidence indicates that some of the checks Professional Premium Service issued to Brown & Smith after Plaintiff and Defendant got the loan and advanced funds to Professional Premium Service were deposited into Brown & Smith's commercial bank account, instead of Brown & Smith's regular bank account. These checks thus may have represented payments to Brown & Smith for purposes other than for the payment of insurance premiums that Professional Premium Service had financed. Plaintiff, however, has not sufficiently proven that these checks were drawn from the $70,000 loan proceeds. The evidence establishes that Professional Premium Service had other investors, other capital, and other funds being generated on accounts receivable out of which these checks could have been drawn. The Court thus concludes that Plaintiff has failed to carry his burden of proof under section 523(a)(2)(A).

■ The Court will now turn to section 523(a)(4). Before the Court can find a debt for fraud or defalcation nondischargeable under section 523(a)(4), the Court must find that Defendant was acting in a fiduciary capacity. This qualification has been limited "to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose." 3 *Collier on Bankruptcy* ¶ 523.14[1][c] (15th ed. 1987) (footnote and accompanying citations omitted). *See also In re Dove*, 78 B.R. 630, 635–36; *Congress Financial Corp. v. Levitan (In re Levitan)*, 46 B.R. 380, 384, 12 Bankr.Ct.Dec. 835, 836–37 (Bankr.E.D.N.Y. 1985). Based upon the evidence presented to the Court, the Court concludes that there was no technical or express trust imposing a fiduciary capacity on Defendant. The relationship between Plaintiff and Defendant was one which might indeed lead to a trust implied by law, but that does not meet the requirements of section 523(a)(4). *Mullis v. Walker (In re Walker)*, 7 B.R. 563, 564, 7 Bankr.Ct.Dec. 68, 69 (Bankr.M.D.Ga.

1980). Therefore, Plaintiff has failed to prove the first ground for exception under section 523(a)(4).

Section 523(a)(4) can be satisfied if Plaintiff proves by clear and convincing evidence that the debt resulted from embezzlement or larceny. *See* 3 *Collier on Bankruptcy* ¶ 523.14[3] (15th ed. 1987). Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." 3 *Collier on Bankruptcy* ¶ 523.14[3] (15th ed. 1987). *See In re Walker*, 7 B.R. at 565, 7 Bankr.Ct.Dec. at 69. Larceny is defined as "the fraudulent and wrongful taking and carrying away [of] the property of another with intent to convert such property to his (the taker's) use without the consent of the owner." 3 *Collier on Bankruptcy* ¶ 523.14[3] (15th ed. 1987). Because the original taking of property was lawful, it is necessary only for the Court to determine if the debt resulted from embezzlement.

■ Plaintiff introduced evidence showing that Professional Premium Service issued checks to Brown & Smith which were deposited into Brown & Smith's commercial bank account and thus could not have been issued for payment on individual homeowner or automobile insurance policies. Defendant admitted that he made short-term loans to Brown & Smith out of Professional Premium Service's funds. Based upon Mrs. Barnes' and Plaintiff's testimony, the Court is persuaded that Plaintiff was unaware of these payments. The evidence also shows that on one occasion, Defendant used Professional Premium Service funds for a personal use, but Defendant testified that he reimbursed Professional Premium Service for these funds. Plaintiff, however, has not shown by clear and convincing evidence that these payments were made from the $70,000 in loan proceeds borrowed by Plaintiff and Defendant. The Court notes that Professional Premium Service had other investors and that income was being generated from the accounts receivable. The Court therefore cannot de-

termine from which source the payments to Brown & Smith were made, and the Court thus concludes that Plaintiff has not carried his burden of proof under section 523(a)(4).