**In re Joseph M. BOWLES, Debtor.**

**James Cape & Sons Co., Plaintiff,**

**v.**

**Joseph M. Bowles, Defendant.**

**Bankruptcy No. 02–20265–SVK.**
**Adversary No. 02–2369.**

United States Bankruptcy Court,
E.D. Wisconsin.

Dec. 16, 2004.

William E. Jamison, Jr., Chicago, IL, for Debtor.

## MEMORANDUM DECISION

SUSAN V. KELLEY, Bankruptcy Judge.

James Cape & Sons Company ("Cape"), initiated this adversary proceeding against Joseph M. Bowles (the "Debtor") contending that an arbitration award Cape received after a botched construction project is not dischargeable in the Debtor's bankruptcy. The court has jurisdiction under 28 U.S.C. § 1334(b); this is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I); and venue is proper under 28 U.S.C. §§ 1408, 1409. This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Fed. R. Bankr.Proc. 7052.

### FACTS

The background and many of the facts are not disputed. The parties have agreed that on July 22, 1999, the United States Army Corps of Engineers awarded an over $15 Million contract (the "Contract") to Bowles Construction Services, Inc. ("Bowles Construction"), a Wisconsin corporation. The Debtor was the president and sole shareholder of Bowles Construction at the time the Contract was awarded, although he later resigned and sold his stock. The Contract involved the construction of a steel revetment barrier along Lake Michigan in Chicago, Illinois, part of a project known as the Chicago Shoreline Storm Damage Reduction Project (the "Project"). Neither party introduced the entire Contract into evidence, although various excerpts from the Contract are part of the record.

Bowles Construction qualified to act as the prime contractor under the Small Business Administration small business set aside program, but Bowles Construction had neither the resources nor the experience to perform the Contract on its own. Accordingly, as it had done in the past, Bowles Construction entered into a subcontract with Cape; Cape has over 1,000 employees and a history of successful large construction projects. Cape is also a Wisconsin corporation. Under their Subcontract dated August 25, 1999 (the "Subcontract"), Cape would perform approximately 80% of the work on the Project. The Subcontract does not contain a choice of law provision.

One of the most important documents in this transaction is also one of the least straightforward. Bowles Construction and the Debtor individually are parties to a $200,000 Supplemental Loan Agreement dated as of September 20, 1999 (the "Loan Agreement"), with Johnson Bank (the "Bank"). The copy of the Loan Agreement submitted into evidence at the trial did not contain the Bank's signature,[1] although the Debtor did not vigorously dispute that he and Bowles Construction were parties to the Loan Agreement, under a format which Bowles Construction and Cape had used on other projects. Cape's status *vis-a-vis* the Loan Agreement is curious: While the Loan Agreement is signed by Cape, and states in recitals that Cape's guaranty of the loan and certain bonds is a pre-condition of the loan, Cape is not named as a party to the Loan Agreement in the preamble, Cape did not actually guaranty any obligations in the Loan Agreement itself (or make any agreements, for that matter), and Cape did not produce any written guaranty by Cape of the Loan Agreement or the bonds.[2]

---

1. A copy of the Loan Agreement executed by the Bank was submitted with Cape's post-trial brief.

2. A copy of the $2,500,000 bond, signed by Bowles Construction, and the Bowles Construction check for the bond premium, was introduced as part of the Debtor's Exhibits.

The provisions of the Loan Agreement that are relevant to this dispute are similarly perplexing, especially those concerning the escrow account required to protect the collateral for the loan. Under Paragraph 1 of the Loan Agreement, Bowles Construction assigned payments received under the Contract to the Bank as security for the $200,000 loan. Bowles Construction then granted Cape a subordinate assignment of the Contract payments to secure all amounts guaranteed by Cape and all obligations incurred by Cape on behalf of Bowles Construction. As stated above, there is no written evidence of any amounts guaranteed or incurred by Cape on behalf of Bowles Construction. Notably, Bowles did not grant a security interest to Cape to secure Bowles Construction's obligations to Cape under the Subcontract.

To facilitate the assignment, Paragraph 2 of the Loan Agreement calls for a lock box arrangement and escrow account "into which [Bowles Construction] and the Bank shall direct the payments or proceeds of payments received by the Bank pursuant to the Assignment of the [Contract]." Bowles Construction agreed to take all necessary or desirable steps required by the Bank to complete and perfect the assignment. The Debtor testified that he submitted a form to the Corps of Engineers to cause the electronic transfer payments under the Contract into the lock box account (the "Lock Box") at the Bank, but the Corps did not comply with his instructions.[3] With one or two exceptions, the payments from the Corps were made by check to Bowles Construction and received by mail at the Chicago office of Bowles Construction.[4] No evidence was introduced that the Bank requested or required any other action with respect to the assignment of the Contract payments, although Cape made various demands (as evidenced by correspondence in August and October 2000) that Bowles Construction direct the Corps to make all future progress payments on the Project directly into the Lock Box at the Bank.

The Loan Agreement contemplated that the parties would agree to escrow instructions for the required "Escrow Account" consistent with the provisions of the Supplemental Loan Agreements for previous projects between Bowles Construction and Cape (none of which were introduced into evidence) and "executed in connection with the first extension of credit under the Credit Facility" (i.e. the $200,000 loan for the Project). Cape introduced the "Supplemental Escrow Instructions" for the Project as an exhibit. Presumably the Supplemental Escrow Instructions for the other projects are more illuminating than the Supplemental Escrow Instructions for this Project, because under the instant instructions, Bowles Construction directed the Escrow Agent to receive, and the Agent agreed to accept, funds from the Bank into the Escrow Account, "and to disburse amounts from the Escrow Account, from time to time as Bowles shall

Cape's only connection to this payment bond was the testimony of Christopher Cape that Cape had guaranteed the bond.

3. A copy of the Direct Deposit Authorization Form, directing payment to the "Bowles Construction Services, Inc. Lock Box Account" at Johnson Bank was submitted with Bowles' post-trial brief.

4. An excerpt from the Contract indicates that all payments made by the Government will be by electronic funds transfer (EFT), unless the Government is unable to release the payments by EFT or the contractor certifies that it does not have a bank account at a financial institution or a payment agent who can receive the payment. There is no evidence that any such certification was given by Bowles Construction.

determine to be necessary or appropriate, and all in accordance with the terms, provisions, conditions and instructions contained in the Escrow Instructions (Lafarge Dam Deauthorization), the Escrow Instructions (Sacramento Crushing Project), the Escrow Instructions (Handicap Entryway Project), the Escrow Instructions (Portage Project) and in the Escrow Instructions (Porch Wing Project)." In effect, the Loan Agreement requires Bowles Construction and the Bank to direct payments received by the Bank from the Project into the Escrow Account, then allows Bowles Construction to disburse those funds pursuant to the Supplemental Escrow Instructions. However, no specific instructions or provisions for the release of the funds for the Chicago Shoreline Project from the Escrow Account are contained in either the Loan Agreement or Supplemental Escrow Instructions for the Chicago Shoreline Project. Rather, Bowles Construction is allowed to disburse the amounts, as appropriate, in accordance with the escrow instructions from other projects, which preceded the Chicago Shoreline Project by one and two years. If the escrow instructions from the prior projects contain fiduciary responsibilities for Bowles Construction relative to Cape, such provisions were not made part of the record; neither party introduced or sought to introduce into evidence the Escrow Instructions (Lafarge Dame Deauthorization), Escrow Instructions (Sacramento Crushing Project), Escrow Instructions (Handicap Entryway Project), Escrow Instructions (Portage Project) or Escrow Instructions (Porch Wing Project).[5]

Christopher Cape and the Debtor both testified that, notwithstanding the provisions of the Loan Agreement and Escrow Instructions, payments under the Subcontract were generally made by checks personally delivered by the Debtor to Cape at Cape's Racine, Wisconsin office. The Debtor testified that he deposited checks received on four payment applications into the Lock Box. The rest of the payments he made directly to Cape. The payments on Payment Application 2 through and including Payment Application 13 were made substantially in the amounts due to Cape, although most payments were significantly later than the due dates under the Subcontract.[6]

In August 2000, payment issues began to surface. The Debtor wrote two letters to Cape outlining a payment schedule for amounts due under Applications 9 through 13, which were due at or around that time. Bowles Construction did pay Cape the amounts stated in the letters, although the payments were made later than promised. In the August 2000 letters, Bowles Construction assured Cape that payments on Application 14 and all remaining Applications would be sent directly to the Lock Box at Johnson Bank. The Debtor testified that at the time he wrote these letters, the payment on Application 14 was not yet due. Beginning with Payment Application 14, under which payment was due in or around October 2000, payments were not made as promised.

The Debtor justified the non-payment by alleging that discrepancies existed and disputes arose. According to the Debtor and his brother, Henry Bowles, who was

---

**5.** The problem is recognized in an October 25, 2000 letter on Bowles Construction letterhead, which states: "My attorney is drafting a revised Supplemental Loan Agreement and Escrow Instructions for you and your attorney to review regarding the Shoreline con-

tract only. There is contract language in both documents that have nothing to do with the Shoreline contract."

**6.** No payment was due to Cape on Payment Application No. 1.

the project manager, Bowles Construction became concerned with delays on the Project, allegedly caused by Cape, and the risk that a liquidated damages penalty would be imposed by the Corps against Bowles Construction. The situation deteriorated in late 2000 and early 2001, and letters from attorneys were exchanged. A demand letter from Cape's attorney dated January 11, 2001 stated that $1,893,000.42 was due for payment applications and stone estimates.[7] A January 29, 2001 response from Bowles Construction's attorney disputed the amount due for the payment applications and the stone. Cape's witnesses testified that the January 29, 2001 letter was the first indication of any disputes about the amounts due for the stone.

In March 2001, a mediation session was held between the parties, facilitated by the Corps. The parties dispute the reason that the mediation failed. An arbitration proceeding was initiated by Cape against Bowles Construction. Bowles Construction terminated the Subcontract with Cape on or about April 16, 2001. After the termination of the Subcontract, some rental equipment was returned to Cape with missing parts, and a trailer owned by Cape was damaged. Total damages for the equipment and trailer was under $10,000.

In May 2001, the Debtor sold all of his stock in Bowles Construction to Marvin Coklow, who had been a financial consultant and then chief financial officer of Bowles Construction. Coklow became the president and sole shareholder of Bowles Construction at that time. There was a brief transition period when the Debtor signed pending pay applications on the Project, but the Debtor testified that after May 2001, he had no further involvement with managing the Project or Bowles Construction. The purchase agreement between the Debtor and Coklow recognized the existence of the disputes and litigation with Cape.

An arbitration hearing was held from October 1 through October 3, 2001 before a panel of three arbitrators in Chicago. The Debtor did not participate on behalf of Bowles Construction, having sold his stock to Coklow, but he did appear as a witness on the final day of the proceedings. Although an attorney on behalf of Bowles Construction attempted to obtain an adjournment of the proceedings—she had only been recently retained by Bowles Construction and there was an unauthorized strike at the Project—the request for adjournment was denied, and the arbitrators' decision states that Bowles Construction appeared by its president, Coklow, without counsel.

In their October 22, 2001 decision, the arbitrators stated that Bowles Construction failed to comply with the arbitration rules and arbitrators' orders. Bowles Construction "ignored virtually all of the pre-hearing procedural requirements and deadlines ... based its case in substantial part on documents that Bowles asserted were available but that Bowles did not bring to the hearings ... and displayed a cavalier approach to the arbitration and a disregard of its contractual duties to the parties with whom Bowles contracted. Although we are mindful of the difference in size and sophistication between the parties, we attribute essentially all of the blame and responsibility for this dispute to Bowles." The arbitrators then awarded $2,360,279.62 in damages to Cape, and

7. In addition to the sums due to Cape on the payment applications, Cape charged Bowles Construction for stone that was removed from the old revetment structure, crushed, and used as backfill for the new steel revetment. The parties disputed the amount due to Cape for the stone.

found that Bowles Construction breached the constructive trust that the arbitrators determined existed under the agreements between the parties. With respect to the Debtor, the arbitrators pierced the corporate veil of Bowles Construction, allowing Cape to pursue the damages award against the "former and/or current owners of Bowles [Construction] as may be appropriate."

The Debtor moved to vacate the arbitration award against himself, personally, in the Circuit Court of Cook County. The Circuit Court noted that in order to set aside an award, "it must be demonstrated that the majority of arbitrators deliberately disregarded what they knew to be the law in order to reach the result they did." Finding that the arbitrators had acted in good faith, the Circuit Court confirmed the arbitration award on June 28, 2002. The Debtor appealed, but the appeal was never prosecuted.

Meanwhile, on January 9, 2002, the Debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code. The case was converted to Chapter 7 on July 10, 2002. On November 5, 2002, Cape filed a Complaint to have the arbitration award declared nondischargeable in the Debtor's bankruptcy, initiating this adversary proceeding. Cape moved for summary judgment, contending that the arbitrators' decision must be afforded preclusive effect, resulting in a nondischargeability determination under Bankruptcy Code § 523(a)(4) (fraud in a fiduciary capacity) or § 523(a)(2)(A) (fraud and misrepresentation). This court issued a decision granting the motion for summary judgment as to liability and damages, but denying the motion to determine that the debt is nondischargeable. In its decision, the court stated that the elements of fraud required under § 523(a)(2)(A) were not established

with particularity by the arbitrators and that the breach of a constructive trust was not sufficient to state a claim under § 523(a)(4). Trial was held on the dischargeability issues and post-trial briefs were exchanged.

## DISCUSSION

■■■■ Under 11 U.S.C. § 523, the creditor seeking to except its debt from discharge bears the burden of proof, and must prove its case by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To further the policy of providing debtors with a fresh start in bankruptcy, "exceptions to discharge are to be construed strictly against the creditor and liberally in favor of a debtor." *In re Scarlata,* 979 F.2d 521, 524 (7th Cir.1992). *Accord In re Morris,* 223 F.3d 548, 552 (7th Cir.2000).

### Elements of nondischargeable debt

#### A. Fraud or Defalcation in a Fiduciary Capacity

■■■■ Cape's main argument is that the debt is not dischargeable under § 523(a)(4) of the Bankruptcy Code, which states in pertinent part:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4) (2004). The elements required to establish a nondischargeable debt under this section are: 1) the existence of a trust; 2) the debtor is a fiduciary of that trust; and 3) fraud or defalcation by the debtor while acting as a fiduciary of the trust. *Chase Lumber & Fuel Co. v. Koch (In re Koch),* 197 B.R. 654, 656 (Bankr.W.D.Wis.1996); *In re Eisenberg,* 189 B.R. 725, 730 (Bankr.

E.D.Wis.1995). Whether a debtor is a fiduciary is a question of federal law; the traditional common law definition of a fiduciary relationship as one involving confidence, trust and good faith, which might apply in any commercial transaction, is too broad, and inapplicable in dischargeability cases. *In re Angelle,* 610 F.2d 1335, 1338 (5th Cir.1980).

■■■ Although the definition of "fiduciary" in this context is a narrowly defined question of federal law, bankruptcy courts look to state law to determine whether the requisite trust relationship exists. *Woodworking Enterprises, Inc. v. Baird (In re Baird),* 114 B.R. 198, 202 (9th Cir. BAP 1990), citing *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986). As recognized in this court's decision on summary judgment, imposition of a "constructive trust" does not rise to the level to impose nondischargeability under the Bankruptcy Code; an express or technical trust is required. A state statute can create the express trust which will be sufficient under § 523(a)(4), but the statute must define the trust res, spell out the trustee's fiduciary duties and, most importantly, impose the trust prior to and without reference to the wrong which created the debt. *In re Marchiando,* 13 F.3d 1111, 1115 (7th Cir.1994) (Illinois lottery ticket sales statute did not create the requisite trust). *See Joseph Lorenz, Inc. v. Thomas (In re Thomas),* 21 B.R. 553, 556 (Bankr.E.D.Wis.1982) (vacated and remanded on damages issue only in *In re Thomas,* 729 F.2d 502 (7th Cir.1984)); *In re Weedman,* 65 B.R. 288, 291 (Bankr. W.D.Ky.1986); *In re Pedrazzini,* 644 F.2d 756, 759 (9th Cir.1981). Does a state statute create the required trust in this case? The parties dispute whether the statutes of Illinois or Wisconsin should be consulted on this issue.

### (1) Choice of Law

In *R2 Invs., LDC v. World Access, Inc. (In re World Access, Inc.),* 301 B.R. 217, 264 (Bankr.N.D.Ill.2003), the Bankruptcy Court stated: "The Seventh Circuit has admonished that before a court 'entangles itself in messy issues of conflict of laws [it] ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' *Jean v. Dugan,* 20 F.3d 255, 260 (7th Cir.1994) (quoting from *Barron v. Ford Motor Co. of Canada, Ltd.,* 965 F.2d 195, 197 (7th Cir.1992), cert. denied, 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992))." In this case, the construction trust fund statutes of Wisconsin and Illinois are significantly different.

■■■ Cape urges the application of Wisconsin law, specifically, the "theft by contractor" provisions of Wisconsin Statutes §§ 779.02(5)[8] and 779.16[9] which create a

---

**8.** Wis. Stat. § 779.02(5) states in pertinent part:

The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor... to the amount of all claims due or to become due or owing from the... subcontractor for labor and materials used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor... for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor... of moneys so misappropriated and is punishable under § 943.20. If the prime contractor... is a corporation, such misappropriation also shall be deemed theft by any officers, directors or agents of the corporation responsible for the misappropriation. Any of such misappropriated moneys which have been received as salary,

trust fund for sums paid by an owner to a general contractor for the benefit of subcontractors and material suppliers. *Kraemer Bros. Inc. v. Pulaski State Bank,* 138 Wis.2d 395, 406 N.W.2d 379, 381 (Wis. 1987). Wisconsin's theft by contractor statute establishes the type of express statutory trust contemplated by § 523(a)(4) of the Bankruptcy Code, and a general contractor's knowing breach of Wisconsin's theft by contractor statute is grounds for holding the debt to the subcontractor nondischargeable. *Koch,* 197 B.R. at 656.

The Debtor asks the court to apply Illinois law to the dispute. In contrast to the fairly broad provisions of Wis. Stat. § 779, Section 21.02 of the Illinois Mechanics Lien Statute [10] provides a limited trust fund only to the extent a subcontractor has provided a waiver of mechanics lien in exchange for funds paid to a prime contractor for the subcontractor's benefit. There is no evidence in the record that lien waivers were given by Cape in anticipation of receipt of any funds; as a federal government project, lien waivers would not have been appropriate. In contrast to the multiple decisions issued by bankruptcy courts analyzing the dischargeability of debts under Wisconsin's theft by contractor statutes, no cases were cited by the parties or located by the court making

dividend, loan repayment, capital distribution or otherwise by any shareholder of the corporation not responsible for the misappropriation shall be a civil liability of the shareholder and may be recovered and restored to the trust fund specified in this subsection by action brought by any interested party for that purpose. Except as provided in this subsection, this section does not create a civil cause of action against any other person...

9. Wis. Stat. § 779.16 states in pertinent part:

All moneys, bonds or warrants paid or to become due to any prime contractor or subcontractor for public improvements are a trust fund only in the hands of the prime contractor or subcontractor and shall not be a trust fund in the hands of any other person. The use of the moneys by the prime contractor or subcontractor for any purpose other than the payment of claims on such public improvement, before the claims have been satisfied, constitutes theft by the prime contractor or subcontractor and is punishable under § 943.20. This section shall not create a civil cause of action against any person other than the prime contractor or subcontractor to whom such moneys are paid or become due. Until all claims are paid in full, have matured by notice and filing or have expired, such money, bonds and warrants shall not be subject to garnishment, execution, levy or attachment.

10. Section 21.02 provides in relevant part:

Sec. 21.02. Construction trust funds. (a) Money held in trust; trustees. Any owner, contractor, subcontractor, or supplier of any tier who requests or requires the execution and delivery of a waiver of mechanics lien by any person who furnishes labor, services, or materials for the improvement of a lot or a tract of land in exchange for payment or the promise of payment, shall hold in trust the unpaid sums subject to the waiver of mechanics lien, as trustee for the person who furnished the labor, services, or materials.

(b) How trust moneys held; commingling. Nothing contained in this Section shall be construed as requiring moneys held in trust by an owner, contractor, subcontractor, or material supplier under this Section to be placed in a separate account. If an owner, contractor, subcontractor, or material supplier commingles moneys held in trust under this Section with other moneys, the mere commingling of the moneys does not constitute a violation of this Section.

(c) Violation of this Section. Any owner, contractor, subcontractor, or material supplier who knowingly retains or uses the moneys held in trust under this Section or any part thereof, for any purpose other than to pay those persons for whom the moneys are held in trust, shall be liable to any person who successfully enforces his or her rights under this Section for all damages sustained by that person.

770 ILCS 60/21.02 (2004).

such a determination under the Illinois statute.

### (2) Wisconsin Law

■ The Subcontract was signed by two Wisconsin corporations, but it is silent on whether Wisconsin law governs any disputes which may arise. Cape argues that Wisconsin law applies even though the Subcontract contains no choice of law provision, because the Loan Agreement states that it is governed by Wisconsin law, and the arbitrators found that the Loan Agreement and Subcontract constituted a "single, overall agreement for performing and structuring the project and the related financial arrangements." However, this finding was made in the context of the power of the arbitrators to decide disputes under the Loan Agreement (which contained no arbitration clause). The arbitrators *did not* determine that the integrated agreement was governed by Wisconsin law, nor did they apply the Wisconsin theft by contractor statutes to the conduct of Bowles Construction and its principals.

Moreover, even if the Subcontract stated that it was governed by Wisconsin law, it is questionable whether the Wisconsin statute could apply to this Project located in the state of Illinois. The theft by contractor provisions are part of the Wisconsin Statutes Chapter 779 concerning construction liens. Liens on real property are undeniably creatures of state law, and it is "universally" held that one state's legislation cannot "prescribe the mode in which lands in another state may be disposed of or title thereto passed from one person to another." 15A C.J.S. *Conflict of Laws* § 19.1 (Westlaw 2004). As such, construction lien laws do not apply to improvements made outside the state. *Carrier Corp. v. J.E. Schecter Corp.*, 347 F.2d 153, 154 (2d Cir.1965) (New York lien laws did not apply to construction project in New Jersey, even though contract stated that New York law applied). *Carrier Corp.* relied on the holding of the Court of Appeals of New York in *Allied Thermal Corp. v. James Talcott, Inc.*, in which the trust fund provisions of the New York lien law were held not to apply to property in Pennsylvania. 3 N.Y.2d 302, 165 N.Y.S.2d 91, 144 N.E.2d 66, 67 (1957). Even though the dissent in *Thermal Corp.* argued that the trust fund, not the real estate, was the focus of the dispute, the majority pointed out that "Only confusion could result from applying one part of a particular state's statutory system to a real property improvement situated in another state where the local statutory scheme is quite different." *Id. See also Albert and Harlow, Inc. v. Great Northern Oil Co.*, 283 Minn. 246, 167 N.W.2d 500, 505 (1969) (Minnesota lien law did not apply to portion of construction project located in Wisconsin); *Mechanical Wholesale Corp. v. Fuji Bank, Ltd.*, 42 Cal.App.4th 1647, 50 Cal.Rptr.2d 466, 470–71 (1996) (California's "stop notice" provisions did not apply to construction project in Hawaii, even though the funds were held in California).

Cape argues for application of Wis. Stat. § 779.16 concerning public improvements,[11] since the Project was owned by the United States Army Corps of Engineers. "Public improvements" is not expressly defined by the Wisconsin Statutes, and § 779.16 read alone does not suggest that the statute is limited to state or local government projects. However, as ex-

---

11. While Cape does not concede it, Wis. Stat. § 779.02(5) does not fit, referring as it does to mortgage proceeds for improvement of mortgaged premises, and money paid by an owner for improvements. As in *Thermal Corp.*, no reference to "in Wisconsin" is necessary to understand that the statute applies to mortgages on real estate and payments for improvements located in this state.

plained by the Wisconsin Supreme Court: "A statutory provision must be read in the context of the whole statute to avoid an unreasonable or absurd interpretation. Statutes relating to the same subject matter should be read together and harmonized when possible." *Highland Manor Assoc. v. Bast,* 268 Wis.2d 1, 6, 672 N.W.2d 709, 711 (Wis.2003). When read in connection with the rest of the statutory scheme, it is apparent that the "public" in "public improvements" in the Wisconsin construction lien statutes refers only to the state of Wisconsin or a county, town or municipality of this state.

Subchapter I of Chapter 779, Construction Liens, has two distinct parts. Sections 779.01 through 779.135 apply to private projects, while §§ 779.14 through 779.17 concern public improvements and public works. The first of the measures dealing with public improvements is § 779.14. In that section, subsection 779.14(1)(c), describes payment and performance assurance requirements for contracts with the state of Wisconsin for a public improvement or public work, and subsection 779.14(1)(d) provides those requirements for "local government contracts." Neither of those could apply to the U.S. Army Corps of Engineers. The next section, 779.15, contains measures for obtaining liens on money, bonds or warrants due for work on public improvements, and expressly mentions only the state, county, town or municipality as a potential debtor. Again, this provision could not apply here. Following is § 779.16, the section relied upon by Cape, in support of the establishment of a trust fund for sums paid to a contractor for a public improvement by the federal govern-

ment. Reading § 779.16 with the provisions that precede it, however, refutes Cape's arguments. Nowhere is the federal government mentioned in any of the Wisconsin lien provisions on public improvements. Cape has not cited a case in which the Wisconsin theft by contractor statute was applied to a public construction project outside the state of Wisconsin.[12]

Although the evidence showed that the Debtor knowingly breached the provisions of Wis. Stat. § 779, since neither case law nor the statute itself supports Cape's position that Wisconsin's theft by contractor statute applies to this dispute, and courts in other jurisdictions have held that similar state statutes do not have extraterritorial effect, this court holds that the provisions of Wisconsin Chapter 779, including the theft by contractor measures, are inapplicable here.

### (3) Illinois Trust Fund Statute

Illinois law properly applies to this dispute, but as noted above, the construction trust fund created by the Illinois statute is limited to situations in which a contractor requests or requires a waiver of mechanics lien from a subcontractor in exchange for payment or a promise of payment. 770 ILCS 60/21.02. Under the statute, the contractor "shall hold in trust the unpaid sums subject to the waiver of mechanics lien, as trustee" for the subcontractor. *Id.* Mechanics liens are not available to subcontractors on federal government projects. *See, e.g., United States v. Munsey Trust Co.,* 332 U.S. 234, 241, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) (Subcontractors cannot assert a right to payment against the federal government,

---

**12.** This may be explained by the Miller Act, governing construction contracts with the federal government, which preempts relief under state lien statutes. *E.g., Interboro Interiors, Inc. v. Structure Tone, Inc.,* 249 A.D.2d 40, 670 N.Y.S.2d 101, 102 (N.Y.App.Div.1998) (causes of action based on trust fund provisions of state lien law preempted by Miller Act).

cannot take liens on public works, and cannot have liens on amounts setoff by the government). There is no evidence in this case that mechanics lien waivers were requested or required from Cape; accordingly the trust created by § 21.02 never existed for purposes of this case. Illinois does not have a "public improvements" section in its lien statutes, comparable to Wis. Stat. § 779.16. And the Illinois version of the Miller Act, the Public Construction Bond Act, 30 ILCS 550/0.01 et seq., does not include any "trust fund" provisions. Therefore, no Illinois statute can be applied to supply the trust under Bankruptcy Code § 523(a)(4).

### (4) Trust Created by Agreement

 In the absence of a trust imposed by statute, it is possible that the agreements between the parties could create the requisite trust.[13] A few cases have recognized examples of § 523(a)(4) fraud in a fiduciary capacity when a debtor has violated a properly structured agreement. See, e.g., In re Falk of Bethlehem, 3 B.R. 266, 273 (Bankr.D.N.J.1980). However, the courts are careful to distinguish between a debtor—creditor relationship with trust provisions imposed by the creditor to enhance collection of the debt, and a true fiduciary or trust relationship that existed prior to any act of wrongdoing. In re Paley, 8 B.R. 466, 469 (Bankr.E.D.N.Y. 1981). In determining whether a trust existed prior to the breach of the trust provisions by the debtor, the Seventh Circuit Court of Appeals in Marchiando, noted that the cases which recognize the requisite trust usually involve a difference in the knowledge or power between the trustee and the beneficiary, such as exists

between an attorney and a client or a director and shareholder of a corporation. 13 F.3d at 1116. In Marchiando, the court concluded that the trust provisions between the debtor, a lottery ticket sales agent, and the state of Illinois, were simply designed to prioritize the state's right to payment for the tickets, evidencing a classic debtor—creditor relationship. Id. Here, Cape would argue that the Debtor's status as general contractor on the Project provided the special knowledge and power with respect to receiving the payments from the Army Corps of Engineers. As a subcontractor, Cape had no direct access to payment for its services and materials, even though Cape was performing 80% or more of the work on the Project.

Moreover, some of the requisite elements of a trust are present in the Loan Agreement, including the mention of a lock box and escrow account. However, the relevant provisions in the Loan Agreement and related Supplemental Escrow Instructions are so unclear and circular as to fail to meet the standards of an enforceable trust. Even if construed generously, based on the parties' testimony as to how the Escrow Account was intended to function, the Loan Agreement and Supplemental Escrow Instructions do not evidence a trustee—beneficiary relationship between the Debtor and Cape. Rather it is apparent that a debtor—creditor relationship existed, similar to that of a retailer who agrees to hold the collateral proceeds of his floor plan lender in trust. See, e.g., Davis v. Aetna Acceptance Co., 293 U.S. 328, 334, 55 S.Ct. 151, 79 L.Ed. 393 (1934) ("[T]he mortgagor, a debtor has bound

---

13. Under Illinois law, "An express trust is created when a settlor manifests an intent to create such a trust and identifies the subject matter of the trust, the nature of the beneficiaries' interests, and the manner in which the trust is to be performed. In re Destron,

Inc., 40 B.R. 927 (Bankr.N.D.Ill.1984) (citing Limperis v. Material Service Corp., 415 F.Supp. 65, 68 (N.D.Ill.1976))." Green v. Pawlinski (In re Pawlinski), 170 B.R. 380, 389 (Bankr.N.D.Ill.1994).

himself by covenant not to sell the mortgaged chattel without the mortgagee's approval. The resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust."). In both *In re Chambers*, 23 B.R. 206, 208 (Bankr.W.D.Wis.1982), and *In re Miles*, 5 B.R. 458, 460–61 (Bankr.E.D.Va.1980), agreements which required the debtors to hold collateral proceeds in trust, in a separate account, were found not to create the requisite fiduciary relationship. *See also Congress Financial Corp. v. Levitan (In re Levitan)*, 46 B.R. 380, 386 (Bankr. E.D.N.Y.1985) ("It is appropriate for the creditor to draft an Agreement which minimizes his risk of loss and protects his collateral. It is not appropriate to make the mere violation of the security agreement a bar to a debt's dischargeability by attempting to transform what is in essence a security agreement into a trust agreement").

The nature of the relationship in this case is that of a debtor and creditor. For example, the assignment of the Contract payments to the Bank is given as security for the Bank's $200,000 loan and thereafter as security for the amounts guaranteed by Cape on behalf of Bowles Construction. This portion of the Loan Agreement evidences only a secured transaction, not a fiduciary relationship between Bowles Construction and Cape. Next, the "Utilization of Escrow and Disbursement of Funds" provision in the Loan Agreement perfects or further enforces the assignment, by providing that payments received by the Bank under the assignment, shall be directed to the Escrow Account, and Bowles Construction shall issue Escrow Instructions consistent with the Supplemental Loan Agreements from previous Bowles—Cape projects. The operative Supplemental Loan Agreements and Escrow Instructions were not introduced into

evidence, but presumably, these Agreements and Instructions contained provisions to assist Cape in recovering on its collateral, i.e., the amounts guaranteed by Cape on behalf of Bowles Construction. Importantly, the Lock Box and Escrow Account provisions do not secure the amounts due from Bowles Construction to Cape under the Subcontract. As the Wisconsin theft by contractor statute demonstrates, a prime contractor can occupy a position akin to a trustee, when he receives money from an owner that is due to his subcontractor. However, by structuring their agreements to create the trust for amounts guaranteed by Cape (the $200,000 loan and the bonds) rather than the amount due under the Subcontract, the parties here only created the same type of commercial loan transaction found lacking in *Davis* and its progeny. In sum, as a device to assist Cape in collecting the debts Cape guaranteed, rather than a reflection of the difference of knowledge or power that Bowles Construction possessed over Cape, *vis-a-vis* Bowles' relationship with the Corps and the collection of payments due on the Project, the trust created by the parties' agreements does not rise to the level necessary for § 523(a)(4). *Marchiando*, 13 F.3d at 1115.

Since this court can find neither an applicable statutory trust nor the requisite fiduciary relationship defined in the parties' agreements, there is no need to reach the issue of whether the Debtor's breach of the agreements rose to the level of defalcation required by *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir.1994). Cape has failed to prove by a preponderance of the evidence that the Debtor committed fraud or defalcation in a fiduciary capacity under § 523(a)(4) of the Bankruptcy Code.

**B. Fraud and Misrepresentation**

Cape also argues that the Debtor's debt is nondischargeable under § 523(a)(2)(A)

of the Bankruptcy Code. The relevant portion of that section provides:

A discharge under section 727... of this title does not discharge an individual debtor from any debt—for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud ...

The Supreme Court has established that § 523(a)(2)(A) should be interpreted according to the common understanding of the terms contained in that Section at the time the statute was enacted. *Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Under the traditional common law rule, a debtor will be liable for (1) a false representation, (2) made with fraudulent intent, i.e., with "scienter," (3) intended to induce the plaintiff to rely on the misrepresentation, and (4) the misrepresentation does induce reliance, (5) which is justifiable, and (6) which causes damage (pecuniary loss). *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997), citing 2 F. Harper, et al., *Law of Torts* § 7.1, at 381 (2d ed.1986); Restatement (Second) of Torts § 525 (1977).

### (1) Use of the Lock Box and Escrow Account

▮ The major false representation that Cape contends was made is that the Debtor would comply with the Lock Box and Escrow Account requirements of the Loan Agreement. The representation is contained in two letters dated August 11 and August 16, 2000, in which the Debtor stated: "Payment Application Number 14 and all remaining applications will be sent directly to existing Johnson Bank Account." The Debtor testified, and Cape did not dispute, that at the time the letters were written, the payment for Application 14 had not come due. Accordingly, the alleged misrepresentation at issue is the Debtor's intent to deposit the proceeds of

Payment Application 14 into the Lock Box in the future. Is the misrepresentation of a promise to do something in the future actionable?

The court in *Super Concrete Corp. v. Shipe (In re Shipe)*, stated that in general, a cause of action for fraud does not exist for misrepresentations as to future promises or facts, but a "narrow exception" exists where at the time the promise was made, the debtor had the intent not to perform the promised act. 41 B.R. 584, 586 (Bankr.D.Md.1984). And, in *Palmacci*, the court elaborated:

Regarding the first element, the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act. A representation of the maker's own intention to do a particular thing is fraudulent if he does not have that intention at the time he makes the representation.... Likewise, a promise made without the intent to perform it is held to be a sufficient basis for an action of deceit. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. This is true even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions.

121 F.3d at 786–87 (citations and internal quotations omitted).

In this case, the Debtor testified that at the time he wrote the letters, he intended to make the requisite payments to Cape on Application 14. However, disputes arose and delays in the Project that the Debtor attributed to Cape caused him to withhold the funds. These disputes were later re-

solved against Bowles Construction by the arbitrators, but this fact does not change the state of Debtor's mind at the time he represented his intentions in August. The Debtor substantially complied with all of the other promises made in the August 2000 letters, lending credibility to his testimony that he did intend to comply with his promise on Payment Application 14 at the time he made the promise. Apparently, in October 2000, when the payment on Application 14 had become due, Marvin Coklow had recently become involved in the Project as a financial advisor. Cape's representatives testified that Coklow told them that he needed to perform "due diligence" before making payments to Cape. Under these circumstances, the Debtor's representations in the August 11, 2000 and August 16, 2000 letters (as well as his alleged contemporaneous oral representations) do not rise to the level of nondischargeable misrepresentation of his intention.[14]

### (2) Payment Issues Being Addressed

 Another example of fraudulent misrepresentation cited by Cape are statements made to Steve Lapish that the payment problems were being worked out between the Debtor and Christopher Cape. However, these representations were made by Henry Bowles, the Debtor's brother, who shared a work trailer with Lapish during the Project. Cape has not cited any authority as to why the representations of the field project manager should be attributed to the Debtor, except the decision of the arbitrators to pierce the corporate veil of Bowles Construction to hold the Debtor personally liable for the arbitration award. The Debtor's liability for the alleged misrepresentation cannot hang on so fine a thread. Assuming Henry Bowles was alleged to be the agent of

the Debtor, in the context of a § 523(a) nondischargeability action, fraud will be imputed to the principal only if it is proven that he knew or should have known of the fraud. *In re Walker,* 726 F.2d 452, 454 (8th Cir.1984). Even if the piercing the corporate veil or an agency theory renders the Debtor liable for all of the representations made by agents of Bowles Construction, Cape did not meet its burden of proving that the representations were made with fraudulent intent. Testimony confirmed numerous meetings, a flurry of correspondence and a mediation session, all of which Henry Bowles could have interpreted as designed to work out the payment problems.

### (3) False Certifications in Payment Applications

 Cape also alleges that the Debtor is liable for Bowles Construction's failure to notify Cape and the Corps that Bowles intended to withhold amounts due to Cape from the payment applications as required by the Contract. The provision on the offset is found on page 51 of a government construction contract that is so voluminous that only excerpts were made part of the record. A similar statement is contained on the face of the payment applications themselves, and it is not disputed that Bowles Construction breached this provision of the Contract. However, the Debtor's signature as president of Bowles Construction on payment applications stating that to the best of his knowledge, information and belief no improper or undisclosed amounts were being withheld from subcontractors, does not, in this court's view, rise to the level of fraud. *See Rotman Electrical Co. v. Cullen (In re Cullen),* 145 B.R. 719, 727–728 (Bankr.D.Mass.1992). For

**14.** Cape also argues that the Debtor misrepresented his intent to pay off the loan at Johnson Bank. For the same reasons, the court

finds that Cape failed to prove that the Debtor did not intend to pay the Bank when he made the promise.

example, the Debtor provided a copy of a November 1, 2000 Direct Deposit Authorization Form for payments under the Contract, which he testified was given to the Corps, but the Corps generally did not honor. Cape's representatives testified that at least one payment application was deposited into the Lock Box after the disputes started in August 2000.

Moreover, by October 2000, Cape knew that disputed amounts were not being paid to Cape. Cape and the Debtor continued to exchange correspondence and attend meetings to resolve the issues. It is difficult to find that Cape justifiably relied on the Debtor's false certifications in the payment applications, when Cape and its attorneys were in constant communication with the Debtor regarding all of the payment issues on the Project. Construing the evidence strictly in the Debtor's favor, as required by the precedent in this Circuit, compels the conclusion that Cape has not met its burden of proof on this issue.

### C. Willful and Malicious Injury

Cape alleges that amounts owed by Bowles Construction of $599.70 (for damage to rental equipment) and $6,165.20 (for damage to a trailer) are nondischargeable under § 523(a)(6) of the Bankruptcy Code, which includes a debtor's debts for "willful and malicious injury ... to property of another entity." To succeed on this claim, Cape must prove that: (1) the Debtor intended to and caused an injury; (2) the Debtor's actions were willful; and (3) the Debtor's actions were malicious. *E.g., Rizzo v. Passialis (In re Passialis),* 292 B.R. 346, 352 (Bankr.N.D.Ill.2003).

"Willful" for purposes of § 523(a)(6) means intent to cause injury, not merely the commission of an intentional act that leads to injury. *Id.* at 352–53 (citing *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)). Under the stringent standards established

in *Geiger,* the creditor must plead and prove that a debtor actually intended to harm, not merely that a debtor acted intentionally and thus caused harm. *Id.* at 353. A debtor must have intended the consequences of his act, and therefore negligent or reckless injuries do not fall within the scope of § 523(a)(6). "Malicious" means "in conscious disregard of one's duties or without just cause or excuse." *Id.* (citing *In the Matter of Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994)). Because a debtor will rarely admit to acting in a willful and malicious manner, those requirements must be inferred from the circumstances surrounding the injury. *Id.*

In the instant case, Cape's representatives testified that equipment rented by Cape, located and used by Bowles Construction on the job site, was missing parts when returned. Cape was charged $599.70 to restore the rented equipment back to working condition. However, this testimony is not enough for Cape to show by a preponderance of the evidence that Bowles Construction was responsible for the damage. The witness did not see the damage being done, and neither he nor Cape were even on the job during the time the damage was alleged to have occurred. It is possible the parts were removed by vandals or someone other than Bowles Construction.

The trailer damage also fails to meet all the elements of a willful and malicious injury. A witness who viewed the scene of the damage testified that the trailer was moved haphazardly by a tractor that gouged the front of the trailer, and that computer and other wires attached to the trailer were cut, rather than unhooked. While this condition may substantiate the "malicious" element of the claim, the testimony fails to indicate how the damage was "willful" on the part of the

Debtor. The witness described a conversation he had with a Bowles Construction employee, when the witness learned someone from Bowles Construction did move the trailer, likely causing the damage. But he also testified he was told that the trailer was moved because Bowles Construction badly needed the space where the trailer was located. Under those circumstances, it is as likely a negligent or reckless act in relocating the trailer, rather than an act intended to damage Cape's property. Without more evidence, Cape has not met its burden that the Debtor caused a willful and malicious injury to Cape's equipment and trailer.

## CONCLUSION

Cape has failed to carry its burden of proof that the damages awarded by the arbitrators against the Debtor arising out of the Chicago Shoreline Storm Damage Reduction Project are nondischargeable under §§ 523(a)(2), (4) or (6) of the Bankruptcy Code. A separate Order dismissing the Complaint will be issued.