In re Nicholas G. WILLIAMS and Amy L. Williams, Debtors.

Scott W. Vieth, Plaintiff,

v.

Nicholas G. Williams and Amy L. Williams, Defendants.

Bankruptcy No. 11–29994–jes. Adversary No. 11–2685.

United States Bankruptcy Court, E.D. Wisconsin.

Sept. 20, 2012.

contest or otherwise affect the lien of Timber Ridge Landscaping, Inc.

Brian E. Running, Running Law Office, Waukesha, WI, for Plaintiff.

Robert K. Steuer, Milwaukee, WI, for Defendants.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

In this adversary proceeding, Scott Vieth ("plaintiff") seeks a determination that

his claim in the amount of $124,200 against debtors, Nicholas and Amy Williams ("defendants") is nondischargeable pursuant to § 523(a)(6) of the Bankruptcy Code.[1]

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and this court has jurisdiction under 28 U.S.C. § 1334.

### Factual Background

In 2006, the defendants, as sole members, formed a Wisconsin limited liability company known as "Twist N Olive LLC" ("LLC"), which operated a cocktail lounge in Delafield, Wisconsin.

In 2009, the defendants actively sought to sell their interest in the LLC, and the plaintiff was an interested purchaser.

On April 13, 2010, the plaintiff signed a letter of intent to purchase the defendants' full ownership interest under the following terms and conditions:

1. Payment of $65,500, representing the balance due on the defendants' home equity line of credit, which was used for business purposes.

2. Payment of $18,700, representing the balance due on defendants' credit card obligation, which also was used for business expenses.

3. Assignment to the plaintiff of defendants' personal guarantee of the balance due on the LLC's SBA loan in the approximate amount of $135,000.

4. Assumption by plaintiff as guarantor, and release of defendants as guarantors, on the business lease between the LLC and Hillside Terrace Shopping Center LLC, the lessor.

Upon signing the letter of intent, the plaintiff paid $1,000 earnest money to the defendants.

On May 4, 2010, a closing was held in connection with this transaction, at which time all of the conditions of sale were satisfied, with the single exception of the plaintiff obtaining a release of the defendants as guarantors of the SBA loan. The SBA did not permit assignment of the loan, as was contemplated by the parties in their initial agreement. Instead, the SBA required that the plaintiff submit a separate application for a new SBA loan, which would then be used to pay off the outstanding balance on the existing loan guaranteed by the defendants. This required certain changes be made to the terms of the sale. Because the SBA had not approved the plaintiff's loan application as of the date of closing, the parties agreed that the plaintiff would pay $83,200 (in addition to the $1,000 earnest money deposit) in exchange for a partial transfer, whereby plaintiff would obtain a 38% membership interest in the LLC and the remaining 62% membership interest would continue to be held by the defendants.[2] The parties anticipated that the new SBA loan application submitted by the plaintiff would be approved on or before May 15, 2010, at which time the defendants' 62% membership interest in the LLC would be transferred to the plaintiff.

---

1. Plaintiff's complaint consists of two causes of action: § 523(a)(2) (for false pretenses, false representation, and actual fraud) and § 523(a)(6) (willful and malicious injury). As a result of this court's order dated May 17, 2012 which granted partial summary judgment to the defendants under § 523(a)(2)(A), plaintiff was precluded from presenting any evidence that the defendants made false statements relating to the financial condition of their limited liability company. Thus, the trial was limited solely to § 523(a)(6).

2. This 38% / 62% division between the parties was based upon the following formula: $84,200 (total payments made by the plaintiff at the May 4, 2010 closing) divided by $219,200 (total payments required to fully complete the terms of the purchase) equals 38.4% (rounded off by the parties to 38%).

Shortly after the closing, the business relationship between the plaintiff and the defendants became strained, resulting in a breakdown in management of the business. The plaintiff complained that he was required to make certain payments from his own personal funds totaling approximately $5,000 for the purchase of inventory and payment of business insurance premiums for which he was never reimbursed. He further testified that he was denied access to the LLC business bank statements and did not have any authority to sign checks on behalf of the LLC.

On June 3, 2010, the SBA wrote to the plaintiff informing him of certain requirements needed before it would even consider approving his proposed SBA loan. By that time, the plaintiff was losing interest in purchasing the business.

Throughout this time period, plaintiff had been acting without counsel. However, in June, 2010, plaintiff retained Atty. Brian Running, and on June 12, 2010, Atty. Running informed Atty. Timothy Langer, who represented the defendants, that the plaintiff no longer wanted to purchase the defendants' remaining interest in the LLC.

On August 28, 2010, matters reached a boiling point. The defendants, who had in their home a surveillance video of the cocktail lounge, observed an individual at the cocktail lounge premises, after hours, removing some "inventory". Mrs. Williams reported this to the Delafield police, who immediately went to the cocktail lounge and confronted the individual, who turned out to be the plaintiff. Mr. Williams testified at the trial that he did not know for certain that it was the plaintiff from observing the surveillance video. This testimony was sharply disputed by the plaintiff, who stated that he was at the cocktail lounge removing martini glasses which he had purchased with personal funds.

By the end of August, 2010, there was a negative balance of $941 in the business bank account. Mrs. Williams testified that the actual balance of outstanding invoices totaled "about $10,000."

On August 30, 2010—two days after the video surveillance incident—the defendants held a member meeting to discuss the LLC's financial condition. The plaintiff was notified in advance of this meeting but, upon advice of Atty. Running, did not attend. The defendants, as majority members, voted to close the business immediately.

After the business was closed, the plaintiff as the guarantor of the business lease, became liable for the breach of the lease which caused him to be sued by the landlord. This lawsuit was eventually settled for $35,000. The plaintiff testified that he was never reimbursed for any of his personal expenditures. He also testified that no portion of the $84,200 investment which he paid to the defendants was returned to him.

The plaintiff then commenced litigation in state court against the defendants for the recovery of his losses. After the defendants filed their bankruptcy petition on June 23, 2011, the plaintiff dismissed his lawsuit.

### Plaintiff's Position

The plaintiff asserts that the defendants closed the cocktail lounge on August 30, 2010 "as a method to inflict vengeance upon me" and added that "it was a way of extracting damages on me because they knew that I was personally responsible for a very large amount of money with the lease guarantee and the fact that I would also lose my initial investment." He further contends that the business had sufficient funds to keep operating into September and October which were historically busier months. He also stated that, if he

been asked by the defendants to advance funds at that particular time, he would have readily done so in order to protect his investment.

### Defendants' Position

The defendants deny that the business had the necessary funds to carry on operations. They assert that the business had to be closed because it was "out of money" and that neither the defendants nor the plaintiff were willing to put in additional funds to carry on the business. Further, the defendants assert that the plaintiff was "difficult to work with" and in view of the differences between the parties on how to operate the business, a "stalemate" was created. Mr. Williams said that the fact that the plaintiff was hurt by the closing "didn't play a part in our decision to close the bar" adding that the closing of the bar "hurt everyone." He further testified that the plaintiff was unwilling to advance any more money for ongoing operations of the cocktail lounge and that there was a complete breakdown if the relationship between the parties.

### Analysis

Sec. 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

The plaintiff must establish all of the following elements in order to prove that the debt is nondischargeable under § 523(a)(6):

1. That the debtor intended to and caused an injury to the creditor's property interest.
2. That the debtor's actions were willful.
3. That the debtor's actions were malicious.

*In re Bowles,* 318 B.R. 129, 146 (Bankr. E.D.Wis.2004). These elements must be proven by the plaintiff by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

It is beyond dispute that the defendants caused an injury to the plaintiff by their actions in closing down the cocktail lounge. However, in order to satisfy § 523(a)(6), more needs to be shown— namely, that such actions were *both* willful and malicious. The absence of one creates a dischargeable debt. *In re Hansen,* 473 B.R. 240, 255 (Bankr.E.D.Tenn.2012) (citing *Markowitz v. Campbell,* 190 F.3d 455, 463 (6th Cir.1999)).

In *Bowles,* 318 B.R. at 146, Judge Kelley defined "willful" as "intent to cause injury, not merely the commission of an intentional act that leads to injury." Judge Kelley also declared "[a] debtor must have intended the consequences of his act, and therefore negligence or reckless injuries do not fall within the scope of § 523(a)(6)." She also defined "malicious" as "in conscious disregard of one's duties or without just cause or excuse." (citing *In the Matter of Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994)). *See also Jendusa–Nicolai v. Larsen,* 677 F.3d 320, 322 (7th Cir.2012), quoting from *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), as follows: "nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."

In *In re Graham,* 472 B.R. 524, 530 (Bankr.W.D.Wis.2012), the plaintiff-bank mistakenly deposited over $64,000 into the defendants' checking account, which the defendants then proceeded to withdraw and spend on business and personal expenses. The defendants explanation was that they were expecting a substantial inheritance from an uncle of one of the defendants and thought that this deposit was part of the inheritance. Judge Martin

decided that the bank had not established that the debtors intended to caused injury to the plaintiff or to the plaintiff's property interests and did not meet its burden of proof for a establishing nondischargeability. He stated that, although the circumstances suggested that each of these elements under § 523(a)(6) had been met, the defendants' alternative explanation as to what occurred was equally probable to that of the plaintiff. He then concluded that, where one inference is as likely as the other, the burden of proof by a preponderance of the evidence has not been met. *Graham*, 472 B.R. at 533. Similarly, in *In re Lane*, 445 B.R. 555 (Bankr.E.D.Va. 2011), the court declined to declare a debt nondischargeable concluding that, even though the debtors' actions were "unwise, thoughtless, and selfish, the evidence does not show that they were malicious." *Id.* at 564.

█ Neither of the parties in the case at bar are sophisticated business people. Both sides demonstrated by their actions a surprising lack of business savvy. The defendants demonstrated their naivete by their mishandling of the video surveillance incident. This court does not accept their explanation that they did not recognize the plaintiff in the video. In addition, defendants' actions in using the $84,200 for their own purposes and in transferring the liquor licenses before the business deal was fully consummated was irresponsible. Moreover, their failure to at least tide over the operation of the cocktail lounge when the busy season was so near was unwise.

The plaintiff also displayed a lack of sound business judgment. His failure to obtain the services of an attorney at the inception of this transaction, and paying $84,200 and obligating himself as the sole guarantor of the business lease before obtaining a 100% membership interest in the LLC was imprudent, to put it mildly. If,

as he testified, he would have been willing to put additional funds into the operation of the cocktail lounge to tide it over until September or October, he should have approached the defendants with this offer rather than wait for the defendants to first make such request.

The court rejects plaintiff's contention that the defendants' decision to close the cocktail lounge was done out of vengeance and for the purpose of inflicting financial damage upon him. The financial damage suffered by the plaintiff was an unfortunate consequence of defendants' actions, but was not what the defendants intended.

### Conclusion

█ It is a well-established general principle of law that exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. *See Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir.1992); *accord In re Morris*, 223 F.3d 548, 552 (7th Cir.2000). This court concludes that the plaintiff has failed to establish by a preponderance of the evidence that the debt owed from defendants to plaintiff is nondischargeable under § 523(a)(6).

The foregoing constitutes this court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

A separate order dismissing this adversary proceeding shall be issued.